CASE 66.—SUIT BY THE STRAIGHT CREEK COAL & COKE
COMPANY AGAINST THE STRAIGHT CREEK COAL
MINING COMPANY.—November 30, 1909.

## Straight Creek Coal & Coke Co. v. Straight Creek Coal Mining Co.

Appeal from Bell Circuit Court.

M. J. Moss, Circuit Judge.

·Judgment for plaintiff, defendant appeals.—Affirmed.

1. Carriers—"Common Carriers"—Switch Track of Coal Company.—One who constructs a railroad switch, under Ky. St. 1909, Sec. 815, authorizing the owner of a coal mine within three miles of a railroad to condemn a right of way for a railroad switch to get his product to market, and providing that the owner of such road shall be, so far as they are applicable, governed by the laws relating to other railroads, and shall have the same right and privileges granted to corporations owning and operating lines of railroads, is not a "common carrier," in contravention of Const. Sec. 210, providing that no corporation engaged in the business of common carrier shall own a mine, so that it can either ship or permit to be shipped by the lessees of its mine all products thereof free of charge.

2. Carriers—Discrimination in Rates.—A coal company, which constructs a railroad switch to its mine and allows the hauling over it of coal of its lessees and others, does not discriminate against such others, whom it charges five cents a ton trackage, by charging its tenants only eight cents a ton royalty; such charge to also cover transportation over the track.

3. Carriers—Discrimination—Lines Operated.—A railroad company, which has a mortgage on the switch road of a coal company coming into its road at P., and without charge puts its empty cars on the switch for the various mine-owners along it, and when they are loaded hauls them over the switch to P., making its charges from P., only, the same to all shippers does not operate the switch as a part of its general system,

so as to be subject to the charge of discrimination on account of the trackage charges made by the coal company owning the switch.

4.  Carriers—Extortionate Charges.—A coal company, which constructs a switch to its mine, and which is, under Ky. St. 1909, Sec. 815, subject to the general railroad laws, to the extent that it cannot make extortionate track charges to others, cannot, till it has been repaid its outlay for construction, be claimed by others to make such extortionate charges; the charges being such as were agreed on with them before the construction of the track as a consideration for the right of way.

5.  Interest—Recovery—Pleading.—No claim of interest having been made in the pleadings by plaintiff, it cannot complain that none were allowed, even from the filing of the suit.

T. B. ANDERSON for Appellant.

D. B. LOGAN and KOHN, BAIRD, SLOSS & KOHN for appellees.

·B. D. WARFIELD and CHAS. METCALF for L. & N. R. R. Co.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

The Straight Creek Coal & Coke Company is a corporation owning large bodies of coal and timber lands in Bell county, Ky.  For more than 10 years it has operated a coal mine on a tract of its land on the waters of Straight creek, about 2¼ miles eastwardly from Pineville.  It also has a coke plant and a sawmill there.  In order to get its products to the market, it owns and operates a railroad switch running from its mines and coke plant to the Louisville & Nashville Railroad at Pineville.  The corporation owns no rolling stock except a few logging cars on which it brings its logs to its sawmill.  It rents an engine from the Louisville & Nashville Railroad Company with which to do the necessary switching of coal cars on the yards at its mines.

In 1905 the corporation desired to develop a large body of its land which lays some four miles northwardly of its coal and coke plant. In order to do this, it entered into a contract with the Louisville & Nashville Railroad Company to build this four miles of additional switch from its mining camp to the property to be developed; the expenditure to be repaid to the Louisville & Nashville by the coal company's paying five cents per ton for every ton transported over the new switch. To further secure the payment of the cost of building the switch, the coal company executed and delivered to the railroad company a mortgage upon its whole railroad switch, and the railroad company agreed to maintain the switch during the existence of the mortgage, and to haul the coal company's coal from its mines to Pineville free of charge. In order to secure the right of way for the new switch, the coal company entered into contracts with the various landowners through whose lands it was proposed to run, by which it was agreed, among other things, that the owner conveyed a right of way 50 feet wide to the coal company, and the latter agreed that the landowner might have the use of the switch for transporting his coal to market at a trackage charge of five cents per ton.

Along the line of the proposed new switch, the Howards owned a tract of land, and they (except one infant to be hereafter noticed) conveyed to the appellee by deed a right of way through their land. The deed contains the agreement between the owners of the land and appellee concerning the trackage charges to be paid by the vendors to appellee for the use of its switch. So far as it is necessary to notice this contract, it may be stated that, as a consideration for the

right of way, the owners of the land and their assignees were to have the use of the switch at a trackage charge of five cents per ton. One of the Howards was an infant, and, although his guardian offered to convey to appellee for the ward his inter-est in the right of way, it was thought better that a friendly condemnation suit should be instituted and carried to judgment in order to fully bind the infant; and this was done. With this exception the record shows that the appellee obtained its entire right of way for the new switch by contract.

During the pendency of the negotiations between appellee and the Howard heirs for the right of way, certain individuals, who afterwards organized them-selves into a corporation called the Straight Creek Coal Mining Company, were negotiating with the Howards for a lease of their property for the purpose of opening and operating a coal mine thereon. This corporation is the appellant in this action. After the switch was built, the appellant opened its coal mine, and for some time shipped coal over the switch to Pineville under the contract made by appellee and the Howards, and during this period paid the trackage charges in accordance with the terms of the contract between appellee and appellant's lessors, the How-ards. Afterwards, however, appellant refused to pay further trackage charges, asserting that appellee was a common carrier and was discriminating against it by not charging other coal miners on its switch any-thing for trackage, and that therefore it was not re-quired to pay anything for the use of the switch.

This position is based upon the following state of facts: In order to induce the Louisville & Nashville Railroad Company to build the four miles of switch

involved here, the appellee company found it neces-
sary to insure the railroad company against loss by
reason of its outlay in building the switch; and to do
this it entered into a contract with the railroad that
it would make certain developments of coal mines
upon its land, which would insure a large haulage over
the road and furnish to the railroad company a large
quantity of freight from Pineville to the various coal
markets of the country. In order to make good this
contract with the railroad company, the appellee
leased parts of its land, which was to be developed by
the switch, to two coal mining companies, and agreed,
among other things, that in consideration for the pay-
ment by its tenants of eight cents royalty on each ton
of coal mined, it would haul, or cause to be hauled, the
coal of its tenants to the Louisville & Nashville Rail-
road for the purpose of being transported to the mar-
ket; it being especially agreed that the eight-cent
royalty was to cover both payment for the coal and
the transportation of it from the mine to the Louis-
ville & Nashville Railroad.

So that the real questions here are: (1) Is the ap-
pellee, in the use of its switch, a common carrier? (2)
If it be such, does the effect of the contract between
it and its tenants result in an illegal discrimination in
the trackage charges as between appellant and the
tenants? It is not disputed by any of the parties to
this record that, if appellee is a common carrier, it
may not discriminate in trackage charges between its
patrons, and that, if it allows any of its patrons to
haul over its switch free, then it cannot charge track-
age against any of its patrons; and therefore, if it be
ascertained that appellee is a common carrier, the
question at once arises: Is the contract with its ten-

ants a discrimination in freight or trackage rates between them and the other patrons along its line?

Appellee, being a corporation engaged in the coal mining business, points out that under the Constitution it cannot be a common carrier; and in support of this position relies upon the provision of section 210 of that instrument, which is as follows: "No corporation engaged in the business of common carrier shall, directly or indirectly, own, manage, operate, or engage in any other business than that of a common carrier, or hold, own, lease or acquire, directly or indirectly, mines, factories or timber, except such as shall be necessary to carry on its business; and the General Assembly shall enact laws to give effect to the provisions of this section." It is obvious that the foregoing provision of the Constitution prohibits appellee, if it be a common carrier, from owning or operating a coal mine. Section 815 of the Statutes authorizes, among other things, the owner of a coal mine within three miles of any navigable stream or railroad to condemn a right of way, not to exceed 50 feet wide, for the purpose of building a switch or tracks in order to get his produce to market. We cannot presume that the Legislature intended by section 815 to authorize a coal mining corporation to violate the Constitution by becoming a common carrier, and therefore we must assume that when the owner of a coal mine or stone quarry, in order to develop his property, builds a railroad switch or track, he does not thereby become a "common carrier" within the meaning of section 210 of the Constitution. But under section 815 of the Statutes "the owner or operator of such road shall be, so far as they are applicable, governed and controlled by the laws re-

lating to other railroads, and shall have the same rights and privileges granted to corporations owning and operating lines of railroad.''

Assuming, then, for the purpose of this case (but not deciding), that appellee built, or caused to be built, its railroad switch under the provisions of section 815 of the Statutes, does the contract with its tenants discriminate against appellant and the other independent mining companies along its lines who are charged five cents per ton trackage? We think not. In the first place, the very object and end of building the switch was to develop appellee's land, and for this purpose it obligated itself to lay out the round sum of about $90,000, and upon which it pays interest until the principal sum is repaid to the Louisville & Nashville Railroad Company. Appellee's tenants represent appellee and stand upon the same plane in the use of its switch, if appellee so desires, as does the appellee itself. The leases which appellee made to its tenants are the instrumentality for the development of the land and rendering it productive. If the appellee cannot lease its land, and is unable to open and operate mines for itself, then the whole purpose of the switch is frustrated. We therefore conclude that, as the switch was built to develop appellee's land, it has a right to either ship, or permit to be shipped by its tenants, all products of the land over the switch, free of charge.

But even if we felt less certain of this view than we do, there is nothing in this record to show that appellant has been discriminated against in favor of appellee's tenants. The tenants pay to appellee eight cents per ton, which by contract covers both royalty and trackage or freight charges. It must be con-

ceded that it has the right to make its royalty as low as it pleases, even to giving its tenant the coal for the mining of it; and, this being true, appellant cannot claim to be discriminated against as long as the tenant is required to pay as much as five cents per ton for both trackage and royalty.   Upon this view appellant cannot say that it is discriminated against until the tenant is required to pay less than five cents per ton for the coal and its transportation to Pineville. It is not disputed that the independent miners along the line of appellee's switch are required to pay precisely the same trackage, five cents per ton; and the only claim of discrimination is in regard to the two mining companies which are the tenants of appellee. It is not disputed that appellee owns the switch in question; that is, it is not disputed that it has obligated itself to pay the Louisville & Nashville Railroad Company for building it the round sum of $90,000, that it pays part of this principle sum annually, and pays legal interest on the unpaid balance until the whole of the principal sum is finally discharged.

One of the contentions of appellant is that appellee has leased its switch to the Louisville & Nashville Railroad Company, and therefore that company is operating it as a part of its general system, and that it is discriminating against appellant.  But the evidence in this case indubitably shows that, while the first written contract drawn up between the Louisville & Nashville Railroad Company and appellee used the word "lease," afterwards it was changed, and a new writing drawn, which showed the real contract between the parties to be that the Louisville & Nashville Railroad Company had a mortgage upon the switch of appellee in order to more fully secure the

repayment of the funds expended by the railroad in the building of the switch; and the evidence further shows that the railroad company puts in its empty cars on the switch for the various mineowners along its line, and when these are loaded hauls them over the switch to Pineville free of charge. In other words, it makes no charge to any of the mining companies for what it does in the operation of the switch. The Louisville & Nashville Railroad Company has adopted Pineville as the general distributing point for all of the mines in that neighborhood, say, in a radius of 15 or 20 miles, and it has one common freight charge from that point to the various markets which it enforces against all the shippers alike. This is called in the record the "Pineville rate," and it is clearly established that this rate is enforced upon all shippers without any discrimination whatever.

The appellant also complains that the trackage rate of five cents per ton is extortionate. The evidence, however, does not bear out this contention. All of the evidence in the case bearing upon this point tends to show that five cents per ton is a reasonable rate under the circumstances. Moreover, it is the rate that was agreed upon by the lessors of the appellee company as a consideration for the grant of the right of way. This is fully set forth in the deed from the Howards to the appellee. The deed also contains a provision that the contract for the use of the appellee's switch redounds to the benefit of all assignees of the owners of the land. It was under this contract that appellant began the use of the switch, and it paid the charges in accordance with the terms of the contract for some time. We conclude therefore that, under the conditions now prevailing, five cents per ton

is a reasonable trackage charge. If, after the appellee company has been repaid its whole outlay, it should be ascertained that five cents per ton is too great a charge, then, upon a proper showing, the rate may be reduced.

The appellee, while not a common carrier, is regulated by the general laws concerning railroads in so far as they are applicable, and therefore the appellee cannot prevent persons along its line from using its switch upon the payment of a proper charge; nor can it make this charge so great as to be either prohibitive or extortionate. But as the rate of five cents was agreed upon in advance, and, acting upon this agreement, appellee has built the switch and incurred a large indebtedness therefor, those who use it cannot be heard to say that this charge is too great or extortionate until appellee has been reimbursed for its outlay. It has to repay the railroad company the original cost price and pay interest on the unpaid balance until the whole is paid. It must also pay all taxes that are assessed against the switch. And certainly it would be inequitable to permit those along the line, who have contributed nothing to the building of the switch, who have no money invested in it, and who do not have to keep it in repair, to use it free of charge. This position would put the owner of the switch in a worse position towards its use than a stranger, because, if the stranger may use the switch without charge as freely as the owner, and pay nothing for the cost of building it, or taxes or repairs, this position is infinitely preferable to that of the owner. We conclude therefore: That the payment of the trackage charges is a condition precedent to the use of the switch; that the amount of five cents per ton, under

present conditions, is not too great; and that appellant must pay it before it has a right to use appellee's property.

None of the cases cited by appellant are apposite to the question in hand. The appellee does not dispute that, if it is a common carrier, it may not discriminate between its patrons, and therefore it is not necessary to discuss any of the numerous cases cited to show that common carriers cannot discriminate in favor of, or against, any of those who ship over their lines. The case of Bedford Stone Co. v. Oman, 115 Ky. 369, 73 S. W. 1038, 24 Ky. Law Rep. 2274, did not involve the question we have here. There the Louisville & Nashville Railroad, under the evidence, owned the switch, and had absolute control of it as a part of its general system, and it was refusing to permit Oman to ship stone over the switch at any rate; in other words, it was refusing to serve him as a common carrier at all. And it was there held that the Louisville & Nashville Railroad, while it had such control and ownership of the switch, could not refuse to haul Oman's freight.

That is not the question here. The Louisville & Nashville Railroad hauls the freight of appellant from the mine to Pineville without any charge to it, and from Pineville to the market it charges appellant the same rate that it charges all other shippers to the same place under the same conditions. The question is not between appellant and the Louisville & Nashville Railroad, but between appellant and the Straight Creek Coal & Coke Company, the owner of the switch; that company being perfectly willing for appellant to use its switch, but asking from it a fair remuneration for its use. The Oman Case is the exact opposite of the case at bar. The case of Greasy Creek Co. v.

Jellico Co., 116 S. W. 1189, involved the constitutionality of section 815 of the Kentucky Statutes, which authorizes the condemnation of private property for coal switches. There was no question of freight rates involved or discussed. All that was decided there was that switches built under section 815 are governed by the railroad law in so far as it is applicable. The court said nothing in that case which would intimate that one mining company might use the switch of another mining company without paying a fair remuneration for its use.

There was no dispute between appellant and appellee of the proper amount which the latter should receive, if it had a right to recover at all; in other words, the number of tons shipped were not disputed, and applying the trackage charge of five cents for each ton would show the proper amount of recovery.

Upon the trial of the case before the circuit judge, he decided the issues herein involved in favor of the appellee, and gave judgment for the sum of $2,247.70, and this judgment is affirmed, both as to the Straight Creek Coal & Coke Company and the Louisville & Nashville Railroad Company.

On the cross-appeal brought by plaintiff, complaint is made that the court erred in failing to allow interest on its claim, at least from the date of the filing of the suit; plaintiff's suit being upon an open, running account. It was clearly within the discretion of the chancellor to allow interest or not; but, inasmuch as no claim for interest was made in the pleadings by plaintiff, it is in no position to complain that none was allowed, and for this reason the judgment is affirmed on the cross-appeal.

BARKER, J., not sitting.