# Dawkins Lumber Company v. L. Carpenter & Company.

(Decided March 26, 1926.)

## Appeal from Breathitt Circuit Court.

1.  Carriers.—Lumber company, operating railway, is not required to receive and haul freight for others, unless it makes itself a common carrier.

2. Carriers.—Lumber company, possessing extensive powers to operate railway, may become common carrier, though it is not incorporated as such.

3. Carriers.—That railway lines maintained by lumber company are only temporary structures does not prevent them from being used for common carriage of goods.

4. Carriers.—Carriage of goods by lumber company maintaining railway only as required by contracts with two other companies does not make it a common carrier.

5. Carriers.—Maintenance of stations and depots is not necessary to make lumber company operating railway a common carrier.

6. Carriers.—Existence or exercise of right of eminent domain is not essential to constitute a common carrier, if it can acquire right of way by purchase, in view of Ky. Stats., section 835a.

7. Carriers—Lumber Company, Transporting Passengers for Hire, for Accommodation, and Freight Under Contract as Necessary Part of Lumber Business, Held Not a Common Carrier.—Evidence that lumber company, not incorporated as a common carrier, transported passengers for hire on its line for accommodation of a separate railway company owned by it, and transported freight under contract for two companies only as a necessary part of its lumber business, held not to show that lumber company was a common carrier.

GEO. B. MARTIN and GRANNIS BACH for appellant.

O. H. POLLARD for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

The Dawkins Lumber Company has appealed from a judgment by which it is perpetually enjoined and restrained from failing or refusing to receive and ship for plaintiff, over its line of railroad and the branches thereof extending from Carver, Kentucky, into Breathitt county, merchandise and other like commodities and freight tendered it for transportation by plaintiffs upon the payment by them of a reasonable consideration therefor, not less than the rates charged other persons for whom defendant transports similar freight; and defendant is thereby ordered to receive and transport for plaintiff freight upon the same terms that it transports similar freight for others upon payment by plaintiff of a reasonable compensation therefor, not less than the rate paid by others for similar services.

For a proper understanding of this case, it is well for us to consider the relation of the Dawkins Lumber Company to some of its associated corporations. The

Breathitt Coal & Timber Corporation owns 50½% of the stock of the Dawkins Lumber Company, the other 49½% of which is owned by the W. H. Dawkins Lumber Company. The Dawkins Lumber Company owns all of the stock of the Big Sandy & Kentucky River Railway Company. The Breathitt Coal & Timber Corporation owns about 35,000 acres of timber land on Quicksand creek in Breathitt county. The Big Sandy & Kentucky River Railway Company owns 24 miles of railroad that extends from its junction with the C. & O. Railway near the Big Sandy river in Johnson county, to Carver in Magoffin county. The Dawkins Lumber Company has built an extension of this railroad from Carver to Mill branch in Breathitt county. It has leased from the Big Sandy & Kentucky River Railway Company the right to operate trains over the latter's railroad from Carver to Royalton on the Licking river, a distance of about five miles. The Dawkins Lumber Company has a contract with the Breathitt Coal & Timber Corporation, giving it the right to cut this 35,000 acres of timber. At Royalton the Dawkins Lumber Company has a large mill for sawing and finishing this timber. For the transportation of this timber from the woods to Royalton the Dawkins Lumber Company has a number of log cars, and several geared type locomotives. The Breathitt Coal & Timber Corporation has on the line of the railroad owned by the Dawkins Lumber Company a coal mine and it has a contract with the Dawkins Lumber Company by which the latter undertakes to haul for the former from one to two cars of coal per day from the former's mine at Betsmann in Breathitt county to Carver in Magoffin county, a distance of about six miles, for the price of ten cents per ton, and the former agrees to furnish to the Dawkins Lumber Company the coal needed for the operation of its locomotives and other engines at production cost. T. C. Minter owns all of the capital stock of the Royalton Supply Company, to which corporation the Dawkins Lumber Company has contracted the sole and exclusive right and privilege of operating and conducting commissaries and mercantile stores of all sorts on the property owned or controlled by the Dawkins Lumber Company, both at Royalton and in its logging operations, provided, however, that the Dawkins Lumber Company does not guarantee that said rights and privileges shall be sole and exclusive, except to the extent it lies in its power to

so make them consistent with the terms of the contract or contracts under which it holds or controls said properties. By this contract the Royalton Supply Company and Minter get the use of a store building and warehouse at Royalton, light for same, and free transportation for merchandise, on the trains of the Dawkins Lumber Company. The Royalton Supply Company is not to assign this contract, and Minter is not permitted to sell control of its capital stock without the written consent of the Dawkins Lumber Company. This contract contains the following:

"The Dawkins Lumber Company further agrees that unless it shall be compelled to do so, by legal order or orders of some official or constituted authority, having power so to do, it will not transport for any other firm, person or corporation, feed or products of the kind, or similar to that dealt in by the party of the second part."

By its charter the Dawkins Lumber Company has plenary powers, a copy of which makes about three pages of the record before us. Some of these powers are: "To lease, construct or otherwise acquire, own, operate, and maintain saw and other mills, buildings, works, commissaries, shops, wholesale stores, houses for hands, stables, log yards, booms, roads, snake roads, tramroads, railroads. . . . " These three pages apparently give it power to do everything, but at the conclusion of these, is this:

"For the purpose of attaining or furthering any of its objects to do any and all other acts and things and to exercise any and all other powers which a co-partnership or natural person could do and exercise, and which now or hereafter may be authorized by law; the foregoing clauses shall be construed both as objects and powers and where otherwise expressed, be in no wise limited or restricted by reference to or inference from the terms of any other clause but shall be regarded as independent purposes and powers, and no recitation, expression or declaration of specific or special powers or purposes herein enumerated shall be deemed to be exclusive; but it is hereby expressly declared that all other lawful powers not inconsistent herewith are hereby included."

A generous state allowed it to clothe itself with almost unlimited rights, none of which were forced upon it, and these multifarious rights if exercised carry with them corresponding duties. The Dawkins Lumber Company not only owns all the stock of the Big Sandy & Kentucky River Railway Company, but the president of the former is the president of the latter, and the same is true as to the vice president, secretary, treasurer, directors, etc.

The fact that the Dawkins Lumber Company has the power to own and operate a railroad, does not require it to do so, and even if it does do so, that fact alone does not require it to receive and haul freight for L. Carpenter & Company, unless it has by its acts and conduct, made itself a common carrier, and we shall therefore examine briefly some of the acts and conduct of the Dawkins Lumber Company. Each day an engineer, fireman, conductor, brakeman, employed by it, begin at or near Mill branch by attaching one of its engines to a train of log cars loaded with logs, to this is attached any empty box cars that may be on hand, and they start out. When they get to Betsmann, they pick up the cars which the Breathitt Coal & Timber Corporation has loaded, usually one or two, and proceed to Carver. At Carver they get orders from the Big Sandy & Kentucky River Railway Company for the movement of this train to Royalton. At this point the bill of lading is made out for the coal. They then attach a passenger car to this train and proceed to Royalton. . The conductor takes up the tickets from the passengers who have tickets, and collects fares from those who have not, and any passenger who desires to ride is invited to occupy this passenger car, and they do pick up passengers not only at Carver, but at other stations between there and Royalton. When they get to Royalton, the passengers alight, and enter another passenger car which is conveyed by the engines and crews of the Big Sandy & Kentucky River Railway Company to Dawkins. This latter company also takes the empty box cars on to their destination, wherever that may be. The Dawkins Lumber Company's crew now makes up another train of unloaded log cars, empty coal gons and box cars loaded with freight for Minter, and this passenger car, and start back to Mill Branch, again collecting fares and tickets from passengers, until they reach Carver. At that point the passenger car is disconnected, and left on a siding. The train proceeds to Mill Branch, setting out the empty

coal cars at Betsmann and the loaded box cars at Mill Branch. The empty log cars are then delivered to such points as they are needed. These tickets and cash fares are reported to the Big Sandy & Kentucky River Railway Company.

The Dawkins Lumber Company insists (a) that it only handles these passengers and this passenger coach as a matter of accommodation for the Big Sandy & Kentucky River Railway Company, and insists that the coal it handles for the Breathitt Coal & Lumber Corporation is only such as is necessary for it to handle under its contract with that company mentioned above, and the same is true of the freight which it handles for Minter. It insists that by so doing it has not become a common carrier. Its contention is that its essential business is a lumber business, and not that of a common carrier. That may be true, but still, if it chooses to make itself a common carrier, it must accept the consequences.

(b) It says it was not incorporated as a common carrier, which is true; but we have seen that its powers are very extensive, and under those powers it can become a common carrier, if it wants to.

(c) That its roads are temporary structures which it expects to change and abandon from time to time, which may be true; still, there is nothing to prevent even such temporary structures from being used for the common carriage of goods.

(d) That the merchandise carried for Minter and for the Breathitt Coal & Timber Corporation is only such as it is required to carry under the contracts noted above, and that such casual service does not make it a common carrier; which appears to be true.

(e) That it has never charged for any of the services rendered from Carver to Mill Branch, except what it charges the Breathitt Coal & Timber Corporation.

(f) That it maintains no stations or depots from Carver to Mill Branch, which seems to be admitted, but the maintenance of stations and depots is not necessary to make it a common carrier.

(g) It says that it has never exercised the right of eminent domain, and does not claim that right; but one of the largest and most successful railroad companies now operating in this state, does not have the right of eminent domain, and even if it had that right, it does not have to exercise it, if it can, without the exercise of it,

acquire its right of way by purchase. In fact, section 835a of the statutes seems to indicate that a railroad company should endeavor to contract with the landowners for right of way before resorting to the right of eminent domain.

To sum up these things, we find that between Royalton and Carver, the Dawkins Lumber Company was at the time this suit was filed, accustomed to transport for hire, passengers who desired transportation, and that between Royalton and Mill Branch it transported freight for such parties as it chose to make contracts with. It excuses its acts by saying that these passengers were transported for the accommodation of the Big Sandy & Kentucky River Railway Company, to which company it reports and pays whatever it receives for transporting them, and that the freight that it transports, it does under the contracts above mentioned, which contracts it regarded as important for it to make as a part of its original purpose of doing a lumber business. As to the sums collected for the Big Sandy & Kentucky River Railway Company, it might be said that inasmuch as the Dawkins Lumber Company owns all the stock of that company, it makes no difference whether this money is paid to the Big Sandy & Kentucky River Railway Company or not, as it all ultimately finds its way into the coffers of the Dawkins Lumber Company. The only difference would be that the profit or loss in the operation would appear on different pages of the ledger.

In Greasy Creek Coal Co. v. Ely Jellico Coal Co., reported in 132 Ky. 692, 116 S. W. 1189, this court said:

"We understand this to mean that these short roads, like trunk lines and other railroads, are subject to the laws affecting common carriers, and that they may be required to serve the public as common carriers. Indeed, such construction seems to have been implied in the opinion in Bedford-Bowling Green Stone Co. v. Oman, 115 Ky. 369, 73 S. W. 1038, 24 R. 2274. It may be that the owner of the track may not have cars and engines with which to serve the public; but if an arrangement can be made with another carrier to supply the necessary equipment, and it is done, we perceive no reason why every interest of the public in the matter is not satisfied. We held in L. & N. R. R. Co. v. P. & Ky. Coal Co., 111 Ky. 960, 64 S. W. 969, 55

L. R. A. 601, 98 Am. St. Rep. 447, that in using such spur tracks the operating railroad company was bound to serve all the public alike, and could not by contract limit its services to one customer upon the spur.''

In the case of Bedford-Bowling Green Stone Co. v. Oman, 115 Ky. 369, 73 S. W. 1038, 24 R. 2274, this court held that the L. & N. R. R. Co. had such control and ownership over the switch in question there, that it could not refuse to haul Oman's freight. That case would seem to hold that a railroad company cannot be a common carrier over one part of its lines and a private carrier over another part. This case is cited and explained in the case of Straight Creek Coal & Coke Co. v. Straight Creek Coal Mining Co., 135 Ky. 536, 122 S. W. 842. In the latter case, the Straight Creek Coal & Coke Company had constructed a switch from its mine to the L. & N. R. R., and rented from the L. & N. R. R. Co. an engine, by means of which it hauled the coal from its mines to the railroad over this switch. It leased a part of its coal holdings to two other companies, and agreed, among other things, that in consideration for the payment by its lessees of 8c royalty on each ton of coal mined, it would haul the coal of its lessees to the L. & N. R. R. for the purpose of transporting it to market. The Straight Creek Coal Mining Company acquired some property from the Howard heirs, and developed a mine adjacent to this switch. For some time it shipped coal over the switch and paid the trackage charges in accordance with the terms of the contract between the Straight Creek Coal & Coke Company and the Howards, which was 5c per ton. Afterwards, the Straight Creek Coal Mining Company refused to pay further trackage charges, asserting that the Straight Creek Coal & Coke Company was a common carrier and was discriminating against it by not charging the other mines on its switch, and that therefore it should not be required to pay anything for the use of the switch. The court held that the Straight Creek Coal & Coke Company was not a common carrier. In the Santa Fe R. Co. v. Grant Bros., 228 U. S. 177, 57 L. Ed. 787, 33 Sup. Ct., 474, it was held that a railroad company was not a common carrier, although it did haul for a contractor some camp equipment for hire, over a portion of its line that was then under construction, but had not been opened to public use.

In Michigan Public Utilities Co. v. Duke, 266 U. S. 570, 45 Sup. Ct. 191, 69 L. Ed. 445, Duke was engaged in hauling automobile bodies from three manufacturing plants in Detroit, Michigan, to an automobile factory in Toledo, Ohio. He employed about 75 men and operated 47 motor trucks and trailers. The state of Michigan claimed that by act 209 of 1923, Duke had to pay a fee as a common carrier, engaged in transportation of persons or property by motor vehicles for hire. Duke sought to prevent the enforcement of the act against him. The Supreme Court in its opinion said:

"Plaintiff is a private carrier. His sole business is interstate commerce, and it is limited to the transportation covered by his three contracts. He has no power of eminent domain, or franchise under the state, and no greater right to use the highways than any other member of the body public. He does not undertake to carry for the public, and does not devote his property to any public use. He has done nothing to give rise to a duty to carry for others. The public is not dependent on him or the use of his property for service, and has no right to call on him for transportation. The act leaves it to the commission to require plaintiff, if he is to use the highways, to be prepared to furnish adequate service to the public. It would make him a common carrier, and subject to all the duties and burdens of that calling, and would require him to furnish bond for the protection of those for whom he hauls. . . .

Further, in that opinion the court held that:

" . . . . To convert property used exclusively in the business of a private carrier into a public utility or to make the owner a public carrier would be taking private property for public use without just compensation, and would violate the due process of law clause of the fourteenth amendment to the federal Constitution."

In Varble v. Bigley, 77 Ky. (14 Bush) 698, 29 Am. Rep. 435, we said:

"When a person has assumed the character of a common carrier, either by expressly offering his services to all who will hire him, or by so conducting his business as to justify the belief on the part of the

public that he means to become the servant of the public, and to carry for all, he may be safely presumed to have intended to assume the liabilities of a common carrier, for he was bound to know that the law would so charge him, and knowing, must have intended it.''

And again:

''But when he has not held himself out in such way as to amount to an offer to carry for all shippers, no one has a right to depend upon him or to demand that, as matter of duty, he shall carry his goods, and he may refuse, though he has room to spare, and his charge for carriage be tendered.''

In Hutchinson on Carriers, section 35, we find this:

''Private carriers for hire are such as make no public profession that they will carry for all who apply, but who occasionally or upon the particular occasion undertake for compensation to carry the goods of others upon such terms as may be agreed upon. They are not common carriers, because they do not make the carriage of goods for others a business, and do not hold themselves out to the public as ready and willing to carry indifferently for all persons any particular class of goods or goods of any kind whatever; and hence the law does not compel them to accept and carry goods for anybody. Having never professed by their course of business, or in any other manner, to carry for all indifferently, they, unlike common carriers, may refuse at will to carry the goods which may be offered, without incurring any liability whatever, and may carry for one person and at the same time refuse to carry for another.''

We have seen above the defendant was not incorporated as a common carrier, but had the power to make itself such if it so desired, but we can find nothing to indicate it has ever done so. The judgment is therefore reversed, with directions to dissolve the injunction granted and to dismiss the petition.

Whole court sitting.