## Smith et al. v. Kentucky Utilities Company.

(Decided February 14, 1930.)

E. H. JOHNSON and R. L. POPE for appellants.

N. R. PATTERSON, D. B. SMITH, GORDON & LAURENT and SQUIRE R. OGDEN for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

The appellants, R. V. Smith, Nannie Smith, his wife, and Maggie Green, brought this action in the Harlan circuit court, in which they asked for a mandatory injunction requiring the Kentucky Utilities Company to furnish to the plaintiffs electric current from its transmission lines at Clover Splint. The lower court denied the relief sought, and they have appealed.

Appellants own a building at Clover Splint, which is occupied both as a residence and a store. Clover Splint is unincorporated. The Clover Splint Coal Company owns a large and extensive mine property there, a number of miners' houses, a commissary, and other buildings. The transmission lines of the appellee were located some distance from Clover Splint, and the coal company, desiring to use electric power in the operation of its mine, and electricity for lighting its mine and buildings and the houses occupied by its employees, constructed a transmission line from the mining camp to the nearest point on a transmission line owned by appellee. After the construction of this transmission line by the coal company, the coal company and the appellee entered into a written contract, pursuant to which the appellee is

maintaining the transmission line and is supplying electric current over it. The contract provides in part:

"The power company shall take complete possession of, entire control over all the main distribution lines and the appurtenances thereunto belonging to distribution and service lines now supplying electric light and power to the houses of the coal company at Closplint, Kentucky, and the coal company hereby agrees to execute instruments of conveyance covering same.

"It is understood and agreed by the parties hereunto that the power company will where necessary rebuild and maintain the present distribution lines in the mining camp above mentioned, said improvements and maintenance to be in accordance with good engineering practice. The power company will hereinafter, as long as this agreement be in effect, make all necessary distribution and service lines extensions for providing electric current to any new houses that may be erected by the coal company. But it is expressly understood that it will not be the duty of the power company to make any extensions where the cost exceeds forty-five dollars ($45.00) for each new house. . . .

"The power company will proceed in a reasonable time to rebuild where necessary, the distribution lines and install meters in accordance with the power company's standard specifications, title to all distribution and service lines and all appurtenances thereunto at said mining camp, not already in the power company will be vested and remain in the power company; and the provisions of this contract pertaining to service and rates are to become binding and effective according to the date previously set forth herein and the date of the beginning of service under this contract shall be deemed the beginning of the initial five-year period.

"It is further agreed between the parties hereto that, if the coal company should cancel this contract, it will pay to the power company the actual cost of all meters installed by the power company, in the various houses belonging to the coal company, the reimbursement to be subject to a deduction of 5 per cent. per annum for depreciation of the amount

invested, and to relieve the power company of all liability for any damages to person or property that might later occur on said lines.

"It is also understood and agreed between the parties hereto that if the coal company should cease permanently to operate its mining camp above mentioned, the power company shall have the privilege of cutting off its service and removing all lines and appurtenances, including everything installed by the power company in any of the houses up to that time, and upon such permanent cessation of operation, the coal company shall be discharged from all liability hereunder."

It is also provided that the contract shall be in effect for a minimum period of five years, but that either party may cancel it at the end of any 5-year period by giving to the other party written notice at least 90 days prior to the expiration of such period. If such notice is not given by either party, then the contract is to continue in force for another period of 5 years. The electric current is being furnished to the coal company, its employees, and to a number of other persons who reside in the vicinity of the coal camp. The transmission line passes within 14 feet of appellants' property.

In their petition they alleged that they requested the Utilities Company to furnish to them electric current and that it refused although it was furnishing electric current to others similarly situated. In its answer the defendant averred that it did not own the transmission line entering Clover Splint, but that it was owned by the Clover Splint Coal Company; that, under its contract with the Clover Splint Coal Company to furnish the latter electric current, it only could furnish current to other persons with the consent of the coal company, and it filed a copy of the contract with its answer. The affidavits of a number of persons to whom the Utilities Company was furnishing current were filed, in which the affiants stated that they had procured the consent of the Clover Splint Coal Company before the electric current was furnished by appellee.

The Kentucky Utilities Company is a public service corporation clothed with the power to exercise the right of eminent domain (Kentucky Statutes, secs. 1599c-1 and 1599c-2; Smith v. Kentucky & West Virginia Power

Co., 207 Ky. 401, 269 S. W. 310), and whenever it undertakes to furnish electric current it cannot discriminate between persons similarly situated. In 9 R. C. L. p. 1196, it is said: ·

> "Electric companies are bound by the implication of the law empowering them to do business, to make no unreasonable discriminations between those whom they furnish with service; that is, they must not be partial, and must serve alike all who are similarly circumstanced with reference to their system, or who are members of any class to which they have undertaken or are otherwise bound to furnish service."

Whether the contract between the coal company and the Utilities Company be treated as one for the sale of the branch transmission line to the Utilities Company, or as a contract merely for its lease for a limited period, it is a part of the general system of the Utilities Company during the life of the contract. The Utilities Company has absolute control of it during that time, and it may not discriminate between persons similarly circumstanced in the zone where service is rendered. The contract places no restrictions on the control and operation of the line by appellee even if it be conceded, which is not decided, that a restriction as to persons to whom service should be rendered would have been valid.

The facts in this case are analogous to those in the case of Bedford-Bowling Green Stone Co. et al. v. Oman et al., 115 Ky. 369, 73 S. W. 1038, 1040, 24 Ky. Law Rep. 2274. The question there involved was the right of shippers other than the Bedford-Bowling Green Stone Company to require the railroad company to accept their freight over a switch. The railroad switch was built by the White Stone Quarry Company under a contract with the railroad company by which the quarry company leased all of the material which went into it from the railroad company upon a stipulated rent to be equal to 6 per cent. per annum on the value of the material furnished, and the quarry company was to keep the switch in repair. Thereafter the Bedford-Bowling Green Stone Company, successor to the White Stone Quarry Company, entered into a contract with the railroad company in which all the terms of the original contract relative to furnishing

materials, keeping the track in repair, and paying rental were recited. The contract then provided that, in consideration of the increased amount of business to be furnished the railroad company, the stone company would be released from paying further rentals and the railroad company would keep the track in repair without cost to the stone company. It was also agreed that the railroad company could cancel the contract under certain conditions. In a suit by third parties to require the railroad company to accept their freight over this switch, the trial court required the railroad company by a mandatory injunction to transport plaintiff's freight over the switch. On appeal to this court this part of the judgment was affirmed, and in the course of the opinion, after referring to the contract between the railroad company and the stone company, it was said:

"This contract, and other evidence in the record bearing upon the question, show that the Louisville & Nashville Railroad Company, during the continuance of this last contract, has the control and management of the railroad switch. It owns, controls, and operates the engines and other rolling stock which pass over the line. It keeps the roadbed in repair, and owns all of the material which goes into it. So far as this record shows, it exercises the same control and dominion over this line that it does over any other part of its system; and we think, by the terms of the contract in question, the switch, during the continuance of the contract, at least, becomes a part of the general system of the Louisville & Nashville Railroad Company. This being so, it cannot lawfully refuse to receive and transport freight belonging to appelles to and from such reasonable points along the line at which they may lawfully ship or receive it."

Cf. Dawkins Lumber Co. v. L. Carpenter & Co., 213 Ky. 795, 281 S. W. 1013; Conway Oil & Ice Co. v. Gibson Oil Co., 175 Ark. 905, 1 S. W. (2d) 60; Oman v. Bedford-Bowling Green Stone Co. (C. C. A) 134 F. 64.

Appellee is a public service corporation, and, as such, is bound to serve the public with substantial impartiality, and may be compelled to supply without discrimination similar facilities to all who are in similar circum-

stances. The transmission line, which is the subject of the contract between appellee and the Clover Splint Coal Company, is connected with the former's main line, and, during the continuance of the contract, is under its supervision and control and is a part of its general system. It follows that, while it owns and controls this branch line, the duty devolves upon it to act without discrimination in the zone in which it renders service.

The Bedford-Bowling Green Stone Co. case cannot be distinguished in principle from the instant case, and the judgment is therefore reversed, with directions to enter a judgment in conformity herewith.