**LONE STAR STEEL COMPANY,**
Appellant,

v.

**Lois McGEE, Appellee.**

No. 23671.

United States Court of Appeals
Fifth Circuit.

June 23, 1967.

Rehearing Denied July 26, 1967.

Robert E. Burns, Burford, Ryburn & Ford, Dallas, Tex., Albert B. Tarbutton, Jr., Lone Star, Tex., for appellant.

Franklin Jones, Jr., Jones, Jones & Baldwin, Marshall, Tex., for appellee.

Before GEWIN, COLEMAN and GOLDBERG, Circuit Judges.

GEWIN, Circuit Judge:

This appeal is from a judgment rendered in an action brought in the United States District Court for the Eastern District of Texas against Lone Star Steel Company (Lone Star) and Texas & Northern Railway Company (T & N) by Lois McGee to recover damages for personal injuries under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60, and the Safety Appliance Act, 45 U.S.C. §§ 1–16. Before trial McGee's motion to dismiss T & N as a party defendant was granted. The district court held as a matter of law that the above federal statutes were applicable and that Lone Star was a common carrier by rail. The jury returned a verdict in favor of McGee for $56,000, and judgment was entered thereon.

McGee alleged in his complaint [1] that he was employed by Lone Star as a railroad switchman. While acting within the course and scope of his employment, McGee alleged that on August 6, 1963, he received injuries to his body which resulted from the negligence of Lone Star. He claimed that Lone Star was negligent in permitting a rail car to be used on its tracks with a defective coupler which could not be uncoupled without the necessity of going between the cars in violation of the Safety Appliance Act and that Lone Star was negligent in failing to furnish him a safe place to work and a safe means and method of work. He alleged that as a result of Lone Star's negligence he received severe, crippling and permanent injuries to his back and other portions of his body and that such injuries had totally destroyed or greatly diminished his earning capacity. He further contended that Lone Star is a common carrier by rail and therefore is subject to the provisions of the Safety Appliance Act and the Federal Employers' Liability Act and is liable to him for his injuries sustained through its negligence.

Lone Star admits that it is engaged in interstate commerce and that it is a carrier by rail. It strenuously denies that it is a *common carrier by railroad,* and therefore claims that the provisions of the Safety Appliance Act and the Federal Employers' Liability Act do not apply to it.

Lone Star's activities were the subject of a pretrial stipulation which will be discussed later. From the facts detailed in the stipulation and from a consideration of the law applicable to such facts, the district court in a pre-trial order held Lone Star to be a common carrier by rail. The issues of whether Lone Star was guilty of negligence or had violated the Safety Appliance Act and the nature and extent of McGee's injuries were submitted to the jury which returned the verdict mentioned earlier.

---

1. We have omitted from our discussion the allegations in the complaint against T & N in view of the fact that the suit was later dismissed as to it.

The sole issue on this appeal is whether the court erred in holding as a matter of law that Lone Star was a common carrier by rail and thus subject to the Federal Employers' Liability Act and the Safety Appliance Act. After a careful study of the record and a consideration of the arguments of both parties, we affirm the judgment of the district court.

The stipulation of the parties as to the activities of Lone Star and T & N in connection with their rail operations contains the following pertinent data: The T & N is a common carrier by rail in interstate commerce. The T & N main line extends from a point inside the Lone Star plant complex to an interchange yard near the junction of its rail facilities with those of the Louisiana and Arkansas Railway Company. T & N performs rail service for Lone Star, for companies located within the Lone Star Plant area, and for companies outside the Lone Star Plant at various locations along its line.

Lone Star owns extensive properties near Lone Star, Texas, within which it operates its main plant for the processing and production of steel and steel products from raw materials. Lone Star produces plate steel with a rolling mill to roll it into pipe. In addition, it produces and ships semi-finished products including coils, slabs, ingots, pig iron and other products such as ammonium sulphate and benzol.

Within its plant proper Lone Star has a complex system of rail trackage covering several miles. As of August 6, 1963, it owned 8 diesel electric locomotives, 94 cars of railroad rolling stock, and 6 railroad cranes. On the same date it had 57 employees performing duties in connection with its rail facilities such as switchmen, brakemen, engineers, firemen and maintenance personnel. In 1963 Lone Star's railroad equipment and crews made 205,248 rail car movements inside the plant. The Interstate Commerce Commission does not check any railroad equipment belonging to Lone Star with the exception of Lone Star's locomotives No. 3 and No. 4. None of the Lone Star equipment operates on T & N's track except these two locomotives.

Lone Star owns 3,308 shares of the 3,313 shares of common capital stock issued by T & N and from October 1, 1955, to September 30, 1965, T & N paid to Lone Star $2,000,000 in dividends. From 1950 to the present the parties have entered into numerous agreements concerning land, cars, rails, locomotives, rail equipment, safety equipment, and the interchange between the parties as to outbound and inbound cars.

Various industries maintain facilities within the Lone Star plant area, and their operations are integrated with the overall operation of Lone Star such as coating and wrapping Lone Star Steel pipe, using Lone Star slag to produce gravel or separating metals from ore thereby reclaiming what would otherwise be a waste product of the Lone Star Steel mill operation. During the past ten years some fourteen entities, independent of ownership or control by Lone Star have maintained facilities within the plant. At least seven of these have shipped and/or received commodities by rail during this period. Three subcontractors engaged in construction work for Lone Star in its plant received material furnished by Lone Star in part by rail. Other entities supplied material and equipment to Lone Star which were received in part by rail and furnished service representatives for installation. Additionally, 66 prime contractors who furnished their own labor, material, equipment, etc., received their supplies in part by rail.

The primary point of interchange between the Lone Star and T & N rail systems is the classification yard located just inside Lone Star's boundary line. The only track in the classification yard not owned by Lone Star is the T & N main line which runs the length of the yard. T & N operates with respect to shipments for Lone Star and the companies located within its plant area in what is known as a "line haul freight movement by rail." In such an operation T & N is obligated to deliver rail cars to the consignee's siding or industry track and

to pick up outbound shipments at the consignor's siding. Therefore rail service between the T & N track in the classification yard and the siding of industries involved is provided and this service is included in the line haul freight rate charged by T & N.

This rail service between the classification yard and the shipper industry is performed by both T & N and Lone Star. Lone Star has handled inbound shipments for one industry, C. A. Hackett, Inc., operating within its plant area and has handled all its own inbound and outbound shipments as well as handled all inbound and outbound shipments for Linde Gas Co., Textar, Inc., and Southwestern Electric Power Co. Also Lone Star has handled the switching movements involving equipment or material of a construction contractor on the plant premises.

Lone Star makes no direct charge by way of tariffs and receives no direct freight revenues for any rail services performed by it, and publishes no tariffs regarding rail movements. However, T & N's freight charge includes a charge for the rail services involved in picking up and delivering cars to a particular industry, as mentioned above, and this charge is made regardless of whether T & N handles the entire rail movement or Lone Star handles a portion of such movement.

It is contended by McGee that under the various agreements between Lone Star and T & N, regarding the operation of their respective rail systems, the parties are engaged in a joint undertaking, that of providing public rail transportation. Additionally, Lone Star actively participates in the operation by actually performing rail services paid for by the industries involved, albeit to T & N, and from which Lone Star receives the payment as dividends from T & N. Therefore, according to McGee, Lone Star is a common carrier under the Federal Employers' Liability Act. Lone Star contends that its intraplant rail operations are plant facilities and do not constitute common carrier operations. Also, Lone Star argues that since it makes no direct charge for its services and does not hold

itself out to the general public as one engaged in the business of transportation for hire, but moves rail cars solely as an accommodation to T & N and the various industries located within its plant and for its own convenience, it is not a common carrier.

The Federal Employers' Liability Act by its terms applies to "[e]very common carrier by railroad while engaging in commerce between any of the several States," 45 U.S.C. § 51, and the Safety Appliance Act by its terms is applicable to "any common carrier engaged in interstate commerce by railroad", 45 U.S.C. § 1.

The common carrier concept has long been in usage. At an early date the term as used in the FELA was held in Wells Fargo & Co. v. Taylor, 254 U.S. 175, 187, 41 S.Ct. 93, 65 L.Ed. 205, 213 (1920) to mean, "one who operates a railroad as a means of carrying for the public [and] * * * . [t]his view * * * is in accord with the ordinary acceptation of the words * * *."

A more recent discussion of the term is found in Kelly v. General Elec. Co., 110 F.Supp. 4, 6 (E.D.Pa.), aff'd 204 F.2d 692 (3 Cir.) cert. den. 346 U.S. 868, 74 S.Ct. 137, 98 L.Ed. 390 (1953) where the district court stated:

"A common carrier has been defined generally as one who holds himself out to the public as engaged in the business of transportation of person or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant."

Neither of the parties questions the fact that T & N is a common carrier and it has been so stipulated. Lone Star admits that it is virtually the sole stockholder of T & N, and that their rail systems are the subject of numerous agreements such as (1) T & N would maintain safety signal equipment on Lone Star rails and maintain various turnouts in

the Lone Star plant, (2) the rental of locomotive equipment, (3) certain tracks would be used for the interchange between the parties of outbound and inbound cars, and (4) T & N could use Lone Star's classification yard for switching purposes in order to serve customers other than Lone Star. Lone Star also admits that it performs rail service between its classification yard and various locations within its plant which T & N is obligated to perform and for which charges are included in the T & N freight tariff.[2]

However, Lone Star points out that these rail movements constitute only a small part of the overall in-plant rail movements made by Lone Star which according to the stipulation totaled more than 200,000 per year. In addition, Lone Star submits that it performed this rail service primarily for its own benefit in that Lone Star was actually a customer of these industries for which it rendered rail service and that it would seriously hinder the effective and efficient operation of its steel mill to allow T & N to use Lone Star's complex intra-plant rail facilities. Therefore Lone Star contends that despite its ownership of and contractual relationship with T & N and despite the fact that it has occasionally performed rail service for other parties, it is merely maintaining a railroad system for its own use and therefore its rail operations

are plant facilities and not those of a common carrier.

■ Courts have long recognized the distinction between plant facilities and "true agencies of transportation." In New York Cent. & H. R. R. Co. v. General Elec. Co., 219 N.Y. 227, 114 N.E. 115 (1916) cert. den. 343 U.S. 636, 37 S.Ct. 400, 61 L.Ed. 941, the court held that where an industry maintains a complicated intra-plant railroad system, such rail operations will be regarded as plant facilities rather than those of a common carrier. The movement of freight within the plant is not common carriage but rather industrial plant usage.[3]

The rail operations of the defendant in Duffy v. Armco Steel Corp., 225 F.Supp. 737 (W.D.Pa.1964) were also held to be plant facilities. Armco was engaged in the manufacture of steel products and owned and operated railroad equipment within its manufacturing plant. This equipment was used to transport material and equipment from place to place in the plant and to Armco's other nearby plant. Inbound railroad cars were delivered by the Bessemer & Lake Erie Railroad to a track within the plant, and the cars were then distributed to various parts of the plant by Armco. This procedure was reversed on outbound shipments. The court held that Armco was not a common carrier under the FELA because its railroad

2. The following is from the brief of Lone Star:

"Most of T&N's freight movements involve line haul movements, which means that the delivering carrier's duty includes the delivery of the rail car in question to the consignee's siding or industry track, and this service is included in the line haul rate charged by the connecting carriers. Conversely, the initiating common carrier ordinarily picks up the car at the consignor's siding, and this service is included in the rate charged."

\* \* \* \* \*

"From time to time the above entities shipped or received materials by rail. Movements of such rail cars to and from Appellant's classification yard were made by T&N for General Dynamics, Gifford-Hill, Inc., Gulf Coast and Reilly

Tar, utilizing T&N crews and equipment but operating over Appellant's tracks from the classification yard to the particular industry location.

"On the other hand, Appellant's crews and equipment made such movements to and from its classification yard within the plant for C. A. Hackett, Inc., Linde Gas, Texstar, Inc. (all located in the south part of the plant) and Southwestern Power Co. (located on the west side of the plant)."

3. See also Malvern Gravel Co. v. Mitchell, et al., 238 Ark. 852, 385 S.W.2d 144, cert. den. 382 U.S. 828, 86 S.Ct. 64, 15 L.Ed. 2d 73 (1965); Powell v. Pacific Naval Air Base Contractors, et al., 93 Cal.App. 2d 629, 209 P.2d 631 (1949); Cooperative Legislative Comm. of Railroad Bhds. v. P.U.C., 149 Ohio St. 511, 80 N.E.2d 159 (1948).

equipment had not been used to transport goods of others, nor had Armco offered their use to the public.

The court in Kelly v. General Elec. Co., 110 F.Supp. 4 (E.D.Pa.1953) aff'd 204 F.2d 692 (3 Cir.) cert. den. 346 U.S. 868, 74 S.Ct. 137, 98 L.Ed. 390 also dealt with the question of whether an industry's operation of its internal rail system constituted such industry a common carrier under the FELA. General Electric was engaged in the business of manufacturing, rebuilding and repairing electrical equipment and other products. As part of its plant equipment it had a system of internal trackage some 2.17 miles in length, 2 switching engines, 9 cars which it rented to rail carriers, and 10 cars which it used for its own purposes. Its tracks were connected to a siding of the Pennsylvania Railroad located within its plant. The railroad delivered cars to the siding and thereafter the cars were removed and distributed throughout the plant by General Electric's switching engines. Occasionally cars containing G. E.'s goods as well as goods of others were removed by General Electric to its buildings where it unloaded its goods and then returned the cars to the siding for delivery by the railroad to the other consignees. It was contended that General Electric was a common carrier because, inter alia, it moved property of others when it moved less-than-carload shipments and when it moved its outbound shipments to the siding, since goods were shipped FOB plant and title to the goods passed as soon as they were placed in the cars. General Electric contended that it maintained its railroad system for its own convenience and necessity in the conduct of its business. The court held that General Electric was not a common car-

rier under the FELA in that it did not hold itself out generally to the public as offering services of transportation for hire, nor was it employed to carry goods of others for hire. The court found that there was nothing to indicate that the public could demand service of General Electric with respect to its rail facilities. The court concluded that moving less-than-carload shipments was for General Electric's own convenience and added nothing to the service contracted by Pennsylvania Railroad and the other consignees and no charge was made for the service. In addition, the court stated that carrying goods inbound and outbound to and from the siding was a common feature in every plant facility, and whether the shipment was inbound or outbound, it still comprised General Electric's products that it had sold or bought, and therefore General Electric was engaged solely in rail services for itself.

In other instances lumber companies which operated railroads primarily for their own use were found by the court to be private carriers, as opposed to common carriers, where the lumber companies engaged in some transportation of persons or property for hire. Dawkins Lumber Co. v. L. Carpenter & Co., 213 Ky. 795, 281 S.W. 1013 (1926); State ex rel. Silver Lake Ry. & Lumber Co. v. Public Service Comm., 117 Wash. 453, 201 P. 765 (1921). The Court found them to be private carriers in that they did not hold themselves out to the public as being engaged in the business of transportation for any who wished to avail themselves of their service but merely rendered rail service for certain people or certain businesses usually pursuant to contract.[4]

4. The following quote from Ward Transport, Inc., et al. v. Public Utilities Comm., 151 Colo. 76, 376 P.2d 166, 169 (1962) aptly differentiates private carriers from common carriers:

"* * * a private carrier is one who, without making it a vocation, or holding himself out to the public as ready to act for all who desire his services, undertakes, by special agreement in a

particular instance only, to transport property from one place to another either gratuitously or for hire. He carries only for persons with whom he has an initial contract, and assumes no obligation to carry for others; and in this lies the chief distinction between a private carrier and a common carrier * * *."

In comparing the railroad operations described in *Armco* and *Kelly* with those of Lone Star, we immediately find important differences. Although the principle use of Lone Star's intra-plant railroad, to move its own goods, equipment, etc., is identical to the rail operations in the above cases, Lone Star is engaged in a method of operation not found in those cases. It is regularly shuttling the goods of other business concerns located within its plant and thereby is performing a part of the total rail services which another railroad, T & N, has obligated itself to perform. We find that these services which Lone Star has undertaken to perform clearly distinguish Lone Star's intra-plant railroad from those in *Armco* and *Kelly*. Additionally, Lone Star's operations are markedly different from those in *Dawkins* and *Silver Lake,* supra. In neither of those cases did the entity involved perform its rail services in connection with an interstate common carrier, whereas Lone Star's services are a necessary part of T & N's total rail operation. As a consequence, Lone Star cannot claim to be a private carrier because by undertaking the obligations of a common carrier, T & N, it holds itself out to the public as being engaged in the business of public transportation. Moreover, since T & N holds itself out to the public as performing all the duties of a common carrier, Lone Star cannot claim that the duties it performs for T & N are not offered indiscriminately to the public.

In deciding whether Lone Star is a common carrier, its railroad operations can be compared to the operation of terminal facilities, Southern Pacific Terminal Co., et al. v. ICC, et al., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); United States v. Brooklyn Eastern Dist. Terminal, 249 U.S. 296, 39 S.Ct. 283, 63 L.Ed. 613 (1919), stockyards, United States v. Union Stock Yard & Transit Co., et al., 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226 (1912); Union Stockyards Co. of Omaha v. United States, 169 F. 404 (8 Cir. 1909), and short line railroads, United States v. State of California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936). Although the business entities in these cases are in a general sense primarily engaged in aspects of rail transportation, while Lone Star is mainly a steel industry and engaged in railroading only as an incident to its business, the criteria used by the courts to determine whether these entities were common carriers are just as applicable in our determination of whether Lone Star is a common carrier.

In *Southern Pacific Terminal Co.* and *Brooklyn Eastern Dist. Terminal,* supra, the terminal companies were found to be common carriers. The Southern Pacific Terminal maintained wharves and docks for the accommodation of import and export traffic and it charged a fixed wharfage for all freight passing over its track facilities which were connected to tracks of the Southern Pacific System. The court found that the Terminal and the railroads comprising the Southern Pacific System which were commonly owned by the Southern Pacific Co., a holding company, had been united into a system of which all were necessary parts; and since the Terminal formed a vital link in the chain of transportation, it was a common carrier and subject to regulation by the ICC. The operation of the Brooklyn Terminal included the transportation of freight from the Terminal to its docks and for these services it was paid by the railroad or steamship company. The Terminal, in contending that it was not a common carrier, argued primarily that it performed solely under contract with the railroads and therefore did not perform services for the public. The court held that the services rendered by the Terminal were public in their nature and of a kind ordinarily performed by a common carrier. The court stated that one is not precluded from being a common carrier merely because the rail transportation services which it renders to the public are performed as agent for another.

The stockyards in *Union Stockyards Co.,* supra, presented essentially the same argument. While admittedly the stock-

yards were rendering a service which the railroads were bound to perform, they insisted that they were not a common carrier because the rail transportation services were performed for the railroad pursuant to contract under which the stockyards received a fixed charge per car and therefore the services were not performed for the public. The court found that the stockyard operation included the carriage of livestock for hire destined to or from its sheds or pens which in effect were the depot of the railroad companies. It was of little significance to the court that the stockyards did not hold themselves out to the public to carry livestock. It was sufficient that the railroad did so hold itself out to the public and the stockyards were willing to perform and actually did so perform a part of the service which the railroad companies had agreed to perform when the livestock were accepted for carriage. Therefore the stockyards were held to be a common carrier engaged in interstate commerce under the Safety Appliance Act.

Similarly, the stockyard in *Stock Yard and Transit Co.*, supra, was found to be a common carrier. Although it had divested itself of its rail facilities by leasing them to the Junction Railroad, it loaded, fed, watered and cared for livestock in transit and received two-thirds of the profit of the Junction Railroad. The Investment Co., a holding company, owned both the stockyard and the railroad. The court held that these companies, the stockyard and the Junction Railroad, engaged in carrier rail services when they loaded freight at the stockyard on cars, transported it for a distance under a through rate and bill furnished by the trunk line carrier, or received freight while in commerce upon a through rate which included terminal service rendered by the two, and completed its delivery to the consignee.

Likewise the California owned State Belt Railroad was held in United States v. State of California, supra, to be a common carrier engaged in transportation by rail under the Safety Appliance Act because it transported freight back and forth from industries to the railroads from which it received a flat charge per car. The court found that the services performed by the Railroad were of a public character for hire and held that all the essential elements of a common carrier were present, that is, the receipt and transportation for the public for hire of cars moving in interstate commerce.

According to these cases various considerations are of prime importance in determining whether a particular entity is a common carrier. First—actual performance of rail service, second—the service being performed is part of the total rail service contracted for by a member of the public, third—the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public, and fourth—remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad. The stockyards, the terminals and the California short line met these conditions and so also does Lone Star.

Unquestionably, Lone Star performs rail services and such services are a part of the total rail transportation contracted for and required by the industries located on its plant site. While it does not perform these services under contract with T & N, it certainly is an integral part of the T & N system of interstate rail transportation. And finally, even though it does not receive money in the form of direct transportation charges from T & N or from the industries serviced, it is for all practical purposes the sole owner of T & N. It is closely allied with T & N, their operations are interwoven, and therefore it receives in the form of dividends a part of the rate charged the industries by T & N. It has been suggested that we cannot ignore the legal individuality of Lone Star and T & N and therefore, we are precluded from

attaching any significance to the fact that Lone Star is essentially the sole stockholder of T & N and consequently receives dividends therefrom. It is contended that stock ownership does not make the two companies one. While we agree with this proposition, we do not think it is controlling because the record does not present a case of mere stock ownership. Instead the record reflects that the operations of the two are highly integrated and mutually dependent. In a similar fashion the court in *Southern Pacific Terminal Co.*, supra, was faced with substantially the same problem and it found the Terminal Co., although a legally separate business entity, to be part of a railroad system. In *Southern Pacific Terminal* the court stated at page 523, 31 S.Ct. at page 286:

"The record does not present a case of stock ownership merely, or of a holding company which was content to hold. It presents a case, as we have already said, of one actively managing and uniting the railroads and the terminal company into an organized system. And it is with the system that the law must deal, not with its elements. Such elements may, indeed, be regarded from some standpoints as legal entities; may have, in a sense, separate corporate operation; but they are directed by the same paramount and combining power and made single by it." 219 U.S. 498, 523, 31 S.Ct. 279, 286 (1911)

Stock ownership also played a part in the court's decision in the *Union Stock Yard* case, supra, where it stated at page 306, 33 S.Ct. at page 88:

"We think that these companies, because of the character of the service rendered by them, their joint operation and division of profits, and their common ownership by a holding company, are to be deemed a railroad * * *." 226 U.S. 286, 306, 33 S.Ct. 83, 88 (1922)

Also courts have specifically rejected as a controlling criterion the status which the entity declares itself to be in determining whether the entity is a common carrier. "Whether a transportation agency is a common carrier depends not upon its corporate character or declared purposes, but upon what it does." United States v. State of California, supra, 297 U.S. at 181, 56 S.Ct. at 422. The answer to the question of whether an entity is a common carrier "does not depend upon whether its charter declares it to be a common carrier, nor upon whether the state of incorporation considers it such; but upon what it does." Brooklyn Eastern Dist. Terminal, supra, 249 U.S. at 304, 39 S.Ct. at 285.

The fact that Lone Star's carriage for other industries comprises only a minor portion of its rail movements also does not prevent it from being a common carrier. The court stated in the *Tap Line* cases: [5]

"But this conclusion [that one is not a common carrier if only a small part of the traffic carried is the property of others] loses sight of the principle that the extent to which a railroad is in fact used does not determine the fact whether it is or is not a common carrier. It is the right of the public to use the road's facilities and to demand service of it, rather than the extent of its business, which is the real criterion deteminative of its character."

Accordingly we conclude that Lone Star has gone beyond the permissible bounds of what is allowed in operating an intraplant rail system as a plant facility. It has not restricted its use to the operation of its steel mill but has adopted the regular practice of transporting for others. In light of the rail services Lone Star has performed, the fact that such services are actually rendered in fulfillment of T & N's obligations as a carrier, and giving consideration to the facts disclosed in the record revealing the close connection be-

---

5. United States v. Louisiana & P. R. Co., 234 U.S. 1, 34 S.Ct. 741, 746, 58 L.Ed. 1185, 1194 (1913). See also Washington Univ. v. United States, 157 F.2d 112 (8 Cir. 1946).

tween the two companies and their mutual dependence on each other, we conclude that both Lone Star and T & N are operating, jointly, a railroad system which constitutes each of them a common carrier.

Judgment affirmed.