**CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY, a corporation, Plaintiff in Error,**

v.

**Aubrey H. WRIGHT, Defendant in Error.**

**No. 36155.**

Supreme Court of Oklahoma.

Nov. 9, 1954.

Rehearing Denied Dec. 7, 1954.

Savage, Gibson & Benefield, Oklahoma City, for plaintiff in error.

Hanson & Green, Oklahoma City, for defendant in error.

O'NEAL, Justice.

The present action is governed by rules and principles applicable in cases arising under the Federal Employers' Liability Act, 35 Stat. 65, 36 Stat. 291, 53 Stat. 1404, 45 U.S.C.A. § 51 et seq. Our inquiry here is limited to three questions:

(1) Did plaintiff bring forth sufficient evidence to go to the jury on negligence and causation, to sustain the verdict rendered?

(2) Was there a complete absence of probative facts to support the conclusion reached?

(3) Was the amount of the verdict excessive?

■ The Federal Employers' Liability Act embodies the common law conception of negligence, subject to certain modifications, which will be noted in our discussion of the applicable facts. The liability imposed under the Act may be enforced either in the Federal District Courts, or State Courts. The State Courts must conform to standards of the Act as they have been construed by the United States Supreme Court.

■ Thus, if plaintiff has brought forth competent and material testimony that his injury resulted in whole or in part from the negligence of an agent or employee of the common carrier, or by reason of any defect or insufficiency, due to its negligence in its appliances, track, roadbed or equipment furnished, and the case is allowed to go to the jury on the question of negligence alleged and its causation, then we cannot disturb the jury's verdict. When, and only when, there is a complete absence of probative facts to support the conclusions reached by the jury, are we authorized to vacate the judgment.

An examination of plaintiff's pleadings indicate that his cause of action is based upon four separate allegations of negligence as follows:

1. The company failed to exercise reasonable care to furnish the plaintiff with a reasonably safe place to work.

2. The company failed to exercise reasonable care to provide a reasonably safe manner or plan for doing the work.

3. The company failed to exercise reasonable care to furnish tools in a reasonably safe condition for the use to which they were required to be put.

4. The company required the plaintiff to work without furnishing him with sufficient help so that he could safely do the work.

On the 10th day of December, 1951, the plaintiff, Aubrey H. Wright, was in the employ of the defendant railroad company as a section employee. Under the instruction of the defendant's section foreman, Wheeler, the plaintiff and five of his co-employees were directed to remove worn rails from defendant's track near the town of Bridgeport, Oklahoma, and install new rails. A number of the new rails were strung along the right of way, and under the direction of defendant's foreman, Wheeler, the employees obtained three sets of tongs, which were employed by the six workers in dragging the new rails in position upon the railroad ties. In dragging the rail to place, and in lifting it in position, the tongs used by Wright and another employee slipped from the rail causing plaintiff to be thrown upon the right of way, resulting in, as he claims, certain physical injuries.

The rail was moved from a point approximately 35 feet down the track to its installation point. Wright and a fellow employee, Smith, were lifting and dragging the end or front of the rail, and the other four employees assisting in the work were spaced to the rear of them. The rail was approximately 39 feet in length and weighed 1300 pounds. When Wheeler, defendant's foreman, instructed Wright and Smith to use the tongs, Smith observed that the tongs were defective in that the pin binding the tongs prevented them from closing properly. Smith told Wheeler the tongs were defective and requested that he be permitted to get some oil to lubricate them. Wheeler stated that they didn't have time to oil the tongs.

The witness, McKay, testified that one set of the tongs were defective; that the tongs could be used in picking up a rail, but that they would slip when used to slide or drag a rail.

Smith, Wright and McKay, experienced section employees in defendant's employ-

ment, testified that in dragging a rail of the weight and length of the rail here involved, and lifting it into place, that from eight to twelve men should be employed to do the work. McKay so testifying, stated that he had been in the employ of the defendant railroad company for twenty-seven years during which period he was engaged as a laborer, foreman in the section or maintenance department, and also as a track superintendent, and that, in his opinion, twelve men should be employed in dragging and placing a rail of the weight and length of the rail here involved upon the ties. He further stated that when twelve men were not on the job that the usual method employed was to roll the rail on the track crossways by the use of a bar, then roll it down the main line rail with tongs to the place where it was to be installed. A number of witnesses testified that pulling or dragging a rail along the right of way with tongs was an improper method to do the work, and that a better and safer way would be to roll the rail along the track with the use of tongs.

Wheeler, the foreman, although denying that the rail was dragged fifteen to twenty-five feet, admitted that if so handled it was an improper way to make the installation in question.

█ We are of the view that the evidence was sufficient to go to the jury on the question of whether the defendant failed to exercise reasonable care to provide a reasonably safe manner or plan for the doing of the work. Also, whether the defendant exercised reasonable care to provide safe tools with which the work was to be done, and whether the number of employees were sufficient to do the work in a proper and safe manner. The jury's finding of negligence and causation are thus sustained.

█ Where we find an evidentiary basis for the jury's verdict, then the rule that, the jury may disregard or disbelieve whatever facts are inconsistent with its conclusion, come into play. Neither was the jury required to find that the negligent acts, as alleged, in their entirety, were the sole cause of the injury. It is sufficient, under the Act, to establish that the injury of the employee resulted in part from the negli-

gence of the railroad company, and if established, then there is liability even though there be a plurality of causes.

In support of defendant's contention that plaintiff's evidence did not support a finding of negligence and causation, and that the trial court erred in overruling its demurrer, it cites our decisions in Chicago, R. I. & P. Ry. Co. v. Watson, 36 Okl. 1, 127 P. 693 and Chicago, R. I & P. Ry. Co. v. Nagle, 55 Okl. 235, 154 P. 667. The first case was decided in 1912—the second case in 1916. In the Watson case the plaintiff, a brakeman on the Rock Island, was ordered by the conductor of the train to unload a number of bundles of iron pipe. In lifting up a bundle of the pipe, another bundle rolled over on the bundle he was lifting thus jerking the plaintiff and injuring his back.

In the Nagle case, plaintiff, a laborer in the Rock Island employ with other fellow employees, was directed by its foreman to clear up and remove debris from the right of way, resulting from a railroad wreck. While so employed he slipped and fell upon some of the debris and broken timber, injuring his foot.

In each case it was held that negligence was not established and that for accidental injuries, or such as occur without any act of negligence on the part of the master, the master is not liable to the injured servant. The evidentiary facts in the cases cited are substantially opposite to the facts established in the case at bar.

Our examination of the cases arising both in the State and Federal Courts, discloses that the courts in their construction and interpretation of F.E.L.A. have given it an increasingly liberal construction which has, apparently, been the basis of sustaining compensatory damages for untoward incidents.

█ The United States Supreme Court has often held that, it is for the jury to resolve debatable questions of fact on which fair-minded men would differ.

In the recent case of Stone v. New York, Chicago & St. Louis Railroad Company, 1953, 344 U.S. 407, 73 S.Ct. 358, 359, 97 L. Ed. 441, the United States Supreme Court reversed the Missouri Supreme Court's finding upon the question of non-negli-

gence. 249 S.W.2d 442. In the opinion it is stated:

"At the time of the injury petitioner was removing old or worn track ties. The rails would be jacked up, the spikes that held the rails pulled, the plates removed, and the tie pulled. The ties were usually pulled with tongs by two men. If there were any old spikes protruding downward from the tie into the ground, three or four men would usually be required to pull the tie.

"There were three other ways to remove a stubborn tie. One was to dig a trench beside the tie and then roll the tie into the trench. Another method was to jack the rail up high enough so the tie would come free. The objection to that method was that the ballast would run under the other ties and produce a hump in the track. Another way was to free the rail from the ties a half-rail length on each side of the tie to be removed and then to jack the rail up, freeing the tie sufficiently so that it could easily be moved. This method had disadvantages on a track as active as this one in that it meant putting up a flag and stopping trains.

"This day Stoughton, the straw boss, used only the first method. Petitioner and one Fish together were unable to remove a tie because, as it turned out, a spike was driven through it into the ground. Stoughton told petitioner he was not pulling hard enough. Stoughton put a bar under the far end of the tie while petitioner and Fish pulled again. Still the tie would not come. Stoughton told petitioner to pull harder. Petitioner said he was pulling as hard as he could. Stoughton then said, 'If you can't pull any harder, I will get somebody that will.' So petitioner, with Fish, gave a hard pull and hurt his back. The tie was finally pulled by four men—two pulling, one prying with a crow bar, one hammering with a maul; and it turned out that the tie had a spike driven through it and extending into the ground."

The court, upon the record thus presented, held:

"In an action under the Federal Employers' Liability Act for injuries sustained by railroad employee in removing track ties, where the evidence shows that methods of removal different from the one used were available and that additional men were available to aid in the removal, it is peculiarly for the jury to determine whether the railroad straw boss, in failing to use such methods or additional men, was guilty of negligence.

"In determining whether a railroad is liable under the Federal Employers' Liability Act for injuries sustained by a railroad employee in pulling up track ties, previous experience in removing ties, alternative ways of removal, the employee's warning that he was pulling on the tie as hard as he could, his superior's command to pull harder, and the fact that more men were usually used for such work, are circumstances for the trier of facts to appraise.

"The fact that a railroad employee who was injured as a result of an act commanded by a superior, and who brings an action under the Federal Employers' Liability Act, protested prior to obeying the command does not place the risk of injury on him."

Clearly, an employer has a duty under the Act to furnish its employees with tools which are reasonably safe, efficient and suitable for the employee's use in the service to be performed by him. Denny v. Montour R. Co., D.C., 101 F.Supp. 735.

The remaining question for our decision is whether the verdict returned and judgment rendered thereon in the amount of $100,000 is so excessive as to warrant its reduction to meet the end of justice.

The record bears evidence tending to support the conclusion that prior to the accident Aubrey H. Wright was in good health and had been employed as a section laborer for the defendant company for several years. After his injury he experienced constant pain in his back and legs and experienced weakness in the use of his legs, requiring the use of a cane to raise himself from a sitting position; that in stooping or

bending the pain was intensified, and that since the accident he has been unable to perform manual labor; that he was 43 years of age, with a life expectancy of 26 years, and was earning $225 per month.

A physician called by the plaintiff, at some length detailed examinations and tests made of the plaintiff's back, spine and legs. He found atrophy in the musculature of his legs and concluded that the condition was due to a lack of proper nerve supply to the musculature. By making several skin scratch tests, he concluded the patient was suffering from hypesthesia of the lateral aspect outer side of the front part of the leg as compared to the same area on the right side, and deduced that there was a loss of sensation in those areas. He concluded the patient suffered severe pain in the vicinity of the fourth and fifth spinous processes. The witness testified:

"* * * In this case it is my opinion that at the time of the original injury the ligaments were torn, the joint capsules were torn and the nerve root was compressed and injured, that is the nerve root coming out of the fourth and fifth foramena. With compression of these nerve roots, irritation is set up, pain is present, and response to pain, and damage in almost any part of the body, such as breaking of a bone is meant by a muscle going into spasm. They contract, they try to protect that part by joining up in a tight contraction. So, in this case, in my opinion, the means nature reacted was a tightening of the muscles resulting in just a further damage to the nerves, because when you tighten it up it again compresses the vertebral bodies and archways and narrowing again the foramen and providing the damage."

In response to a hypothetical question the Doctor expressed an opinion that the injuries received by plaintiff on December 10, 1951, resulted in plaintiff's physical condition.

Another physician and surgeon, called by the plaintiff, testified that he had examined and treated plaintiff more than twenty times over a period of a year; that from these examinations, tests and observations made,

he concluded the patient was suffering from a pressure of the lumbosacrol plexus of nerves. The witness was asked the following question, and gave the following answer:

"Q. Why does this man have pain in his leg as well as his back? A. These nerves come out the openings here, we call them the foramen. Those foramen have been narrowed down because of the twisting ligaments in the back, and it makes pressure on these nerves as they come out through the bony openings and just pinches down like a stick going through an opening, the bones just pinch down on the nerve."

In the opinion of the physician the injuries received by plaintiff on December 10, 1951, resulted in plaintiff's physical condition. Each physician testified that the patient's physical condition was permanent in its character, and he would not be able to do manual work in future years.

Two physicians called by the defendant testified that from the patient's history of the accident, and their examinations of the patient, including X-rays taken and interpreted, they were of the opinion that the patient had not been injured to any degree that would require future medical treatment to his back; they found the spinous processes of the patient entirely normal.

It was solely within the province of the jury to resolve the existence of the injury and its extent if they believed the testimony of the physicians and surgeons testifying in plaintiff's behalf; they were warranted in concluding that plaintiff's physical condition would incapacitate him from performing manual labor in the future, and that he had and would continue to suffer pain from the result of the injury.

The record before us is exceptionally free from error in the admission or rejection of proffered evidence. Neither party complains of the court's instructions or the refusal to give requested instructions. Defendant moved for a new trial upon the ground that the excessive damages appear to have been given under the influence of bais, passion and prejudice. This contention is based solely upon the amount of the

verdict and defendant, therefore, insists that the trial court should have required a remittitur.

Defendant has called to our attention previous decisions of courts in which verdicts were vacated as excessive indicating bias, prejudice or passion or were modified by requiring a remittitur.

Plaintiff, by an appendix to its brief, cites many cases from State and Federal Courts approving judgments in substantial amounts. These references are neither authoritative nor persuasive, as in the final analysis each case must be decided upon its individual facts and circumstances.

Detriment is a loss or harm suffered by the person wrongfully injured and the measure of damages is the amount which will adequately compensate for all detriment proximately caused thereby. The element of detriment arising out of diminution in earning power, and past and future medical expenses are susceptible to some degree of mathematical computation. Neither the jury nor the judge has any norm, standard or yardstick to measure the anguish of pain and suffering. Necessarily, the rule of reason must apply.

Finding no substantial error, the judgment below is affirmed.

JOHNSON, V. C. J., and WELCH, CORN, DAVISON, ARNOLD, WILLIAMS and BLACKBIRD, JJ., concur.

HALLEY, C. J., dissents.