The KANSAS CITY SOUTHERN RAILWAY COMPANY, a Corporation, Plaintiff in Error,

v.

Clarence W. HAYNES, Defendant in Error.

No. 37343.

Supreme Court of Oklahoma.

Dec. 10, 1957.

Rehearing Denied Jan. 14, 1958.

Kelly Brown, Muskogee, Windham & Windham, Poteau, for plaintiff in error.

Alpheus Varner, Poteau, Ratner, Mattox & Ratner, Wichita, Kan., for defendant in error.

CORN, Vice Chief Justice.

Plaintiff, resident of Heavener, Oklahoma, brought this action against defendant, a railway company operating within this state and engaged in interstate commerce, to recover damages for personal injuries alleged to have been received as the proximate result of certain acts of negligence upon the part of defendant, its agents and employees.

The factual background, disclosed by the pleadings and evidence reveals the following circumstances. After a term of employment in 1952 as a brakeman plaintiff had been laid off; and a short time thereafter had returned to work as a helper in the signal department. On April 15, 1954 defendant's foreman (Sanders) accompanied by plaintiff traveled by motorized hand car from Heavener to a switch point on the railroad (Page) where two other helpers were taken from another crew, and the four employees then continued to another switch point at Howard, Arkansas, approximately 24 miles from Heavener. Approximately one and a half hours time was required to travel this distance by the motorized hand car. The work to be carried out was the conversion over to a new type of switch point rods, an integral part of the central, electrically operated, switching system installed on defendant's railroad in compliance with Interstate Commerce Commission requirements.

Proper changing of a switch ordinarily occupied about half a day and, prior to the occurrence hereafter mentioned, this crew had replaced some nine switches. One switch had been replaced at Howard in the forenoon of the day in question. Changing of the switches was accomplished by unbolting the old switch rod, and by use of mauls and pry bars the new switch was placed in position, the bolt holes aligned and the switch bolted tightly to tie the switch rods to the switch points. The switch rods operated by electrical impulse, moved the switch points to provide the means for turning a moving train from the main track to a siding, thus increasing the efficiency of operations, particularly on portions of the road having only a single track. The points slid back and forth upon heavily steeled "abrasion plates" secured to the ties along the switch, and which were required to be greased to insure proper operation.

About 3 P. M. the day of the accident it began to rain, and the crew was completing changing of the switch rod. Defendant's foreman, who had been working with others of the crew, ordered the men to get finished up, or cleaned up, so the crew could complete the return trip to Heavener by quitting time. Plaintiff and another hand were left to tighten the bolts on the newly installed switch rod, while the foreman and the other employee walked to a place some hundred yards away and placed the motor car upon the tracks. The car then was moved to the place of work, the tools and switch rods previously removed were loaded onto the car and the return journey begun. Two men were let off the car at their own section point, plaintiff was let off near Heavener, and the foreman completed the journey alone. Plaintiff made no mention of injury, but on the following work day the foreman was advised plaintiff had strained his back and let plaintiff off to seek medical attention.

Plaintiff's petition alleged the foreman peremptorily directed plaintiff to "clean up" because speed was essential in order to get out before one of defendant's trains was due; when this order was given the crew member working near plaintiff was engaged in tightening bolts on the switch rod and was about 30 feet away; the switch rod which was removed, and which weighed 130–140 pounds, was lying between the rails; in complying with the

foreman's order and direction plaintiff stooped, grasped and lifted this switch rod and turned to his left in order to throw same off the tracks; in so doing plaintiff's foot slipped on the greasy, muddy tie upon which he was standing, severely straining the ligaments and muscles of plaintiff's back and causing painful and permanent injuries. Plaintiff charged defendant with negligence in the following particulars:

1. Failure to furnish sufficient number of employees to complete work in safe manner.

2. Failure to furnish reasonably safe place in which to work.

3. Peremptory command by defendant's foreman when he knew, or should have known, no assistance was available, and that plaintiff would be exposed to severe injury by immediate obedience to such peremptory command.

4. Defendant's agent knew, or should have known, such peremptory command would inspire immediate obedience and deprive plaintiff of opportunity to reflect upon hazard or danger to which he was exposed.

Defendant answered by general denial of the matters alleged in the petition. The further defenses of assumption of risk and contributory negligence relied upon were ordered stricken from defendant's answer. The issues raised by these pleadings were tried to a jury.

The evidence relied upon by plaintiff to establish his cause of action, other than matters above mentioned disclosed that prior to the accident he had been a healthy, energetic individual 34 years of age, able to engage in heavy, manual labor and strenuous activities. Subsequent to his injury he was unable to engage in other than light activities, was unable to bend or walk more than a short distance, suffered pain, and had to lie down frequently. Plaintiff testified that he obeyed the foreman's direction to clean up the work area. Prior to the accident the foreman had instructed him and other two workmen to go

some distance down the track and get three switch rods; when plaintiff mentioned the rods were heavy the foreman stated that a big, husky man like plaintiff needed no help, from which plaintiff assumed that carrying a switch rod was ordinarily a one man job.

One witness for plaintiff (Gurber) was a retired railway signal department employee, who had spent eight years as an inspector for the Interstate Commerce Commission. The witness testified a signal helper was the lowest class laborer on construction work, and testified in detail concerning the nature, function, and operation of the switch rods necessary for operation of the central traffic control system used by defendant. The witness further testified as to the necessity for and means generally used in cleaning and oiling the abrasion plates under the switch points; oiling of these plates is necessary and after being cleaned oil is brushed over such plates; trains moving along the track tend to spread this oil on the abrasion plates, but no need existed for oiling the rods, switch points or ties; many times presence of oil upon the ties would be the result of carelessness of the employee cleaning the switch.

On cross-examination the witness stated that, in his experience, anything heavy and hard to handle always was handled by two men, and in moving a switch rod two men always picked it up and "put it over their shoulder."

Two witnesses for plaintiff (Gilham and Steelman) had worked as track maintenance men. Both testified that when changing switch rods there was a crew of six men and ordinarily two men were used to handle the rods.

Two other witnesses, acquaintances of plaintiff, testified relative to his physical condition prior to the accident, and corroborated the testimony as to his physical appearance and inability to perform manual labor after the accident.

The medical testimony of an orthopedic surgeon established the nature and extent

of the disability resulting from plaintiff's injury; medical examination some time after the accident showed his condition, unchanged and plaintiff was unable to do manual labor. An operation had been recommended and generally two operations were required to remedy the condition, and even when successful, the patient generally suffered (25%–35%) permanent partial disability. Cross-examination established existence of a defect in plaintiff's bottom vertebra, tending to produce a displacement of the opening through which the nerve root passed, causing pain, weakness and reflex changes. This defect probably had existed since childhood, but had been bridged by a ligament which held the bones together until the accidental injury stretched or tore the ligament. No substantial issue is presented as to the nature and extent of plaintiff's injury, although it is suggested that the condition from a pre-existing injury made plaintiff more susceptible to accidental injury. However, the evidence was that plaintiff's disability was the direct result of the accidental injury of which he complained. In view of this uncontroverted evidence, and the absence of any substantial controversy as to this phase of the case, no need exists for further discussion.

Defendant's evidence controverted that of plaintiff in all respects, except as to his physical capabilities prior to the accident, the nature of the injury and the loss of capacity to perform manual labor after injury. One witness (Eddy), defendant's trainmaster at Heavener, detailed the nature of the centralized traffic control system, a required improvement, which was properly installed. He had no knowledge of plaintiff's injury until after suit was filed. All employees received a book of regulations and instructions before going to work; the matter of handling heavy materials was left to the employee, and the rules advised that in case of doubt or uncertainty "a safe course must be taken." Plaintiff had been issued and signed for a book of the operating rules and regulations. There was additional testimony concerning the medical treatment, assistance and hospitalization provided for employees.

Defendant's foreman (Sanders) recalled the incident of plaintiff claiming an injury, and testified at length concerning the project of changing the switch rods. Changing of this switch was done in the usual and ordinary manner with proper tools and the necessary number of men. When the switch had been changed witness told two men to finish tightening the bolts and took the other man about 100 yards down the track and loaded the motor car onto the track; no loud or boisterous command was given—but only told the men when the work was finished they would try to get out of the rain; the motor car was pushed up to the place of work and the men loaded the tools and switch rods. On the return trip two men were let off in their section and plaintiff was let off at Hodgens; plaintiff said nothing indicating his having suffered an injury until, upon inquiry from the foreman the next morning, plaintiff stated he had strained his back. Plaintiff was let off to go see a doctor, but when the foreman returned later in the day plaintiff was at home and had not seen the doctor. The witness worked with other three men, and four men were all that were needed to change switches. Cross-examination disclosed that the switch rods which were removed could not be left by the tracks, but had to be moved to the shoulder.

An employee of defendant (Fox) testified concerning the nature, location and manner in which the work was being done; during the course of the work the men were within speaking distance and nothing unusual happened; the same number of men were used as on other jobs and proper tools were used; no difficulty was encountered and the foreman told them when the work was completed they would clean up and go home; he noticed nothing unusual happen to plaintiff and did not hear him make any statement, although witness at all times was within 15–20 feet of plaintiff; the switch rods which had been taken out were left between the tracks; when they started to clean up plaintiff picked up one

rod and threw it out while witness picked up the other without difficulty; if it had been necessary to carry a rod a long distance two men would have picked it up and placed it on the car. The foreman always worked like the other men, and when he spoke of cleaning up and going home it was not in a loud or boisterous manner. Cross-examination disclosed the witness had been employed by defendant nearly thirteen years and within such time had been instructed by foreman as to how to do work and handle weights, and employees were furnished bulletins and circulars. Witness knew nothing concerning plaintiff's foot slipping while at work.

Another employee (Walker) was working on the date of plaintiff's accident; this was regular work and there was no difficulty; upon completion this witness and the foreman went approximately 100 yards away to get the motor car; during all the work the men were within talking distance of each other; witness did not know plaintiff had been hurt until the next morning when the foreman came to work. Witness testified on cross-examination he was experienced in this work, was working as foreman at the time of trial, and stated that when an order was given it usually would be followed.

Defendant's roadmaster in that area (Leaird) testified installation of the new switch system fulfilled Interstate Commerce Commission requirements; only ordinary tools are needed for such installations; the old rods are easily removed and installation of new rods is a simple matter.

Defendant's signal supervisor for the district testified installation of new switch rods was an uncomplicated job; no more than two men can work on the rod at the same time as the area is too small; there would be no necessity for having more than four men at work on the job. Neither of these witnesses knew anything concerning plaintiff's injury.

At the close of the evidence defendant renewed its demurrer to the evidence, which motion was overruled. The case was submitted to the jury under instructions from the trial court, and the jury thereafter returned a verdict in plaintiff's favor ($25,-000) upon which the judgment appealed from was rendered.

■ The assignments of error relied upon for reversal of the judgment are presented under four propositions, the first of which asserts the insufficiency of the evidence to prove a cause of action. This is presented under four subdivisions, each of which is devoted to one of the separate elements plead by plaintiff as establishing actionable negligence on the part of defendant. The basic premise of the argument simply is that the evidence wholly fails to support any of the allegations of negligence. It is in view of this argument that the evidence has been reviewed at considerable length.

■ The action having been brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., defendant's argument for the most part is supported by decisions from the Federal Courts, stating the rules that the Act, supra, does not make the employer an insurer of the employee's safety, and the obligation imposed upon a railroad company (to use reasonable care in furnishing a safe place in which to work, safe tools and appliances and sufficient employees) does not impose liability for injury, regardless of due care and whether the injury was reasonably to be anticipated. See generally Fleming v. Kellett, 10 Cir., 167 F.2d 265; Wolfe v. Henwood, 8 Cir., 162 F.2d 998; McGivern v. Northern Pac. Ry. Co., 8 Cir., 132 F.2d 213; Gill v. Pennsylvania R. Co., 3 Cir., 201 F.2d 718. Without discussion it may be conceded that the general principles enunciated in the cases cited by defendant are correct. But, it must be recognized that defendant's position fails to take into consideration other basic principles which always are to be considered in such cases.

By separate statement of each allegation of negligence, coupled with reference to testimony respecting each such allegation, defendant concludes that the evidence af-

firmatively disclosed the absolute lack of any negligence upon defendant's part. Consideration of two principles make this position untenable.

First, essentially this identical position was taken, and argument advanced in Union Pac. R. Co. v. Hadley, 246 U.S. 330, 38 S.Ct. 318, 319, 62 L.Ed. 751, 755, cited by plaintiff. In the body of the opinion the following statement is made:

"On the question of its negligence the defendant undertook to split up the charge into items mentioned in the declaration as constituent elements and to ask a ruling as to each. But the whole may be greater than the sum of its parts, and the Court was justified in leaving the general question to the jury if it thought that the defendant should not be allowed to take the bundle apart and break the sticks separately, and if the defendant's conduct viewed as a whole warranted a finding of neglect. Upon that point there can be no question. We are not (333) left to the mere happening of the accident. * * *"

Second, it is disclosed that the evidence was conflicting as respected elements relied upon by plaintiff to establish actionable negligence. There was evidence that this work should have been, and in many instances was, handled by a larger crew. There was evidence that the ties in the area of plaintiff's work were covered with oil and this condition was unnecessary and should not have existed. As defendant states, the fact rain fell did not contribute negligence, but there was testimony that defendant's foreman directed the men to hurry and get cleaned up so they could get out of the rain and also stay ahead of a scheduled train.

A jury trial is an integral part of the Federal Employers' Liability Act. When issues, such as those appearing in the present case, are entrusted to a jury it must be borne in mind that in some instances it is impossible to establish negligence by precise evidence and with the same meticulous certainty possible in proving the facts in other types of cases. Fact finding does not require mathematical certainty. Jurors are supposed to reach conclusions upon the basis of common sense, common understanding, and fair beliefs based either upon evidence given by direct statements from witnesses, or proof of circumstances from which necessary and proper inferences may be drawn. In Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 744, 90 L.Ed. 916, there appears the following:

"When ever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

And, in Tennant v. Peoria & Pekin Union R. Co., 321 U.S. 29, 64 S.Ct. 409, 412, 88 L.Ed. 520, it was said:

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instruc-

tions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable."

In Fleming v. Kellett, 10 Cir., 167 F.2d 265, relied upon by defendant, the rule and reasoning from the Lavender case, above quoted, was restated. Two, of the most recent decisions from this court involving consideration of the sufficiency of the evidence to sustain a jury verdict are Chicago, Rock Island & Pac. Railroad Co. v. Wright, Okl., 278 P.2d 830, and Midland Valley R. Co. v. Manios, Okl., 307 P.2d 545. Both decisions recognized and applied the rule that debatable questions of fact upon which reasonable men might differ must be resolved by the jury; and, where there is evidentiary basis for the jury's verdict the jury may disregard or disbelieve facts inconsistent with its conclusion.

The extent of the conflict in the evidence in relation to the elements of negligence has been pointed out heretofore. That the jury chose to disbelieve or disregard some, or all of defendant's evidence bearing upon the issues asserted by plaintiff provides no basis upon which this court justifiably can substitute its judgment for that of the jury.

■ Defendant next contends the verdict is excessive and the result of passion and prejudice. The argument is based upon the medical testimony disclosing plaintiff to be suffering from a previous injury, in all likelihood of childhood origin. From this defendant concludes that when injured plaintiff already was suffering from the previous injury, and probably to a greater extent than the disability resulting from his accidental injury. Without consideration of plaintiff's life expectancy, earning capacity, need for future medical attention and pain and suffering, all of which might have combined to produce a much larger verdict, we are of the opinion the evidence clearly negatives defendant's argument. Although the presence of a pre-existing bodily condition was admitted, the medi-

cal testimony sufficiently established the accidental injury as the cause of disability. Such testimony also showed the necessity for two future operations to correct plaintiff's condition, and even if successful plaintiff probably would have 25%–35% permanent partial disability. The amount of the verdict was greatly below the total amount which the jury could have found within the permissible limits of the evidence, which clearly discloses that the plea of excessiveness is without substantial merit.

■ Defendant's third contention is that the trial court erred in the admission of prejudicial testimony. The first complaint is that it was highly prejudicial for the court to permit plaintiff to testify that it was his opinion he would not have been injured had there been another employee assisting him in handling the switch rod. It is not pointed out wherein substantial prejudice resulted to defendant. However, such complaint seems without substance in view of the fact that one of the issues was whether sufficient workmen were employed.

■ Prejudice also is claimed in the court's allowing the plaintiff's doctor to answer a lengthy hypothetical question propounded by counsel, in that the question was not sufficiently based upon the testimony. The complaint is that the question incorporated matters relative to the length of time plaintiff had worked at changing switch rods, and also concerning plaintiff's foot slipping off the tie. Since the record discloses positive and direct testimony concerning these two matters, (incorporated into the hypothetical question) the complaint that such question was not based upon the evidence is unfounded. There is no showing that the evidentiary matters urged as prejudicial resulted in a miscarriage of justice sufficient to justify reversal of the judgment founded upon a jury verdict. City of Tulsa v. Pearson, Okl., 296 P.2d 788.

■ The final contention is predicated upon the error claimed in the trial court's refusal to give certain of defendant's re-

quested instructions, and in the giving of certain other instructions, to which defendant objected. Hereunder it is urged the trial court committed reversible error in overruling defendant's motion for directed verdict. It is argued that because, in view of the "Operating Rules", (which defendant supplied for instructing employees) plaintiff knew, or should have known, under these rules that if he undertook to perform a task to which some danger might be connected it was his duty "in case of doubt or uncertainty" to take the safe course. Hence, defendant concludes since the testimony upon this feature was uncontradicted, plaintiff had no right of recovery and the motion for directed verdict should have been sustained. Supporting this argument defendant points to our holding in Kurn v. Reese, 192 Okl. 78, 133 P.2d 880, a case involving an employee's violation of a specific, standing company rule.

We are of the opinion the rule of the cited case is not controlling herein. The distinguishing features are readily apparent. The cited case involved a positive violation of a known rule. To apply the rule of the Reese case herein it would have to appear that plaintiff had a right to choose between a safe and an unsafe method to perform his task and chose the unsafe method. The evidence was such that the jury could, and did find that plaintiff was performing the task at which he was injured as ordered, and was left without a choice in the matter.

█ There is further argument based upon the instructions given. The length of the instructions given, as well as those requested by defendant and refused by the trial court, precludes piecemeal recitation and comparison to point out the various grounds of complaint. Careful examination of the entire instructions given, with particular reference to those portions pointed out by defendant as being erroneous or misleading, impels the conclusion that the jury was adequately and fairly instructed as to the law applicable to the issues. And, the theories of defense defendant sought to

have presented by requested instructions were sufficiently submitted for consideration, so that no error resulted from such refusal. See Midland Valley R. Co. v. Manios, Okl., 307 P.2d 545.

Judgment affirmed.

DAVISON, HALLEY, JOHNSON, WILLIAMS, BLACKBIRD, JACKSON and CARLILE, JJ., concur.