MALVERN GRAVEL CO. v. MITCHELL.

5-3343                                                    385 S. W. 2d 144

Opinion delivered December 21, 1964.

[Rehearing denied January 18, 1965.]

*Joe W. McCoy, James C. Cole, Wood, Chessnutt &
Smith, Rose, Meek, House, Barron, Nash & Williamson,*
for appellant.

*Wendell O. Epperson, Lookadoo, Gooch & Lookadoo,*
for appellee.

SAM ROBINSON, Associate Justice. The issue here is
whether the appellant, Malvern Gravel Company, is
liable under the Federal Employers' Liability Act for
injuries sustained by appellees, Arlie Mitchell and James
Rogers, who were employees of the gravel company at
the time they were injured. There were jury verdicts for
the plaintiffs, Mitchell and Rogers. The gravel company
has appealed. If there is substantial evidence that the
gravel company is a common carrier, within the mean-
ing of the Federal Employers' Liability Act, the trial
court was correct in refusing to direct a verdict for ap-
pellant, but if there is no substantial evidence that the
gravel company is a common carrier within the meaning
of the aforesaid Act, the judgments must be reversed.

Mitchell and Rogers, while working in the due course
of their employment, were underneath a railway car clos-
ing a defective hopper door on a car which belonged to
the Missouri Pacific Railroad Company. They were se-
verely injured when an employee of the gravel company,
while operating a switch engine, shoved a railway car
into the car under which appellees were closing the hop-
per door.

Mitchell and Rogers, as employees of the gravel com-
pany, were awarded compensation under the Arkansas
Workmen's Compensation Law, which limits the amount
of compensation recoverable. Later, they filed suits in
the Hot Spring Circuit Court against the Missouri Pa-
cific Railroad Company, the Malvern & Ouachita River
Railroad Company, and the Malvern Gravel Company,
alleging that the defendants were common carriers en-
gaged in interstate commerce; that they were, therefore,
liable to appellees under the Federal Employers' Lia-
bility Act. Under that Act, notwithstanding the Arkan-

sas Workmen's Compensation Law, there is no limit to the amount of recovery for a personal injury. *Missouri-Kansas-Texas R. Co. of Tex.* v. *Waddles*, 203 S.W. 2d 350; *Schirra* v. *Delaware, L.&W.R. Co.*, 103 F. Supp. 812.

The cases of the plaintiffs against the defendants were consolidated and proceeded to trial. After all parties had rested, the court directed a verdict in favor of the Malvern & Ouachita River Railroad Company, and there is no appeal from the court's action in that respect. The jury returned verdicts in favor of each plaintiff in the sum of $200,000 against the Missouri Pacific Railroad Company and the Malvern Gravel Company. Presumably, the Missouri Pacific settled the judgment against it. In any event, it is not a party to this appeal. Only the gravel company has appealed.

The principal issue, and the only one we reach, is whether the appellant, Malvern Gravel Company, is a common carrier within the meaning of the Federal Employers' Liability Act. Although it is engaged in interstate commerce, if it is not a common carrier as such a carrier has been defined by the Federal Courts, it is not liable under the Act.

The Federal Employers' Liability Act provides: "Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . ." 45 U.S.C.A., Sec. 51.

The Malvern & Ouachita River Railroad Company, hereinafter called M & O, was issued a charter in Arkansas as a railway company in 1929. Actually, the M & O did not transport anything for anyone and was incapable of doing so. It only owned a right-of-way of about 1¾ miles with no rails thereon. As rolling stock, it

owned one switch engine, but no tracks on which to operate it and no railway cars to pull. It never, at any time, operated as a railroad or as a common carrier within the meaning of the Federal Employers' Liability Act. Although it may have been a common carrier under the provisions of Arkansas Constitution, Article 17, Sec. 1, and because of having exercised the right of eminent domain, it was not a common carrier within the meaning of the Federal Employers' Liability Act. The U.S. Supreme Court has said: "In our opinion, the words 'common carrier by railroad' as used in the act, [Federal Employers' Liability Act], mean one who operates a railroad as a means of carrying for the public,—that is to say, a railroad company acting as a common carrier. This view not only is in accord with the ordinary acceptation of the words, but is enforced by mention of cars, engines, track, roadbed and other property pertaining to *a going railroad.*" *Wells Fargo & Co.* v. *Taylor*, 254 U.S. 175, 41 S. Ct. 93. (Our emphasis.)

In 1932, the Malvern Gravel Company was chartered as a corporation. The incorporators were entirely different from those who had incorporated the M & O in 1929. At the present time, the Malvern Gravel Company owns the controlling stock in the M & O but there is no showing as to when the gravel company acquired the M & O stock. Sam Clark is the president of both companies. He became associated with both companies about 15 years ago. As a corporation, the gravel company is authorized to excavate, mine, quarry and produce, refine, grade, crush, dress, manipulate, amalgamate and prepare for building and construction purposes or otherwise, prepare for market, and to purchase, manufacture, make, acquire, sell or otherwise dispose of, distribute, and generally deal in and with gravel, sand, stone, rock, clays, ores, metals, and vegetable and mineral substances and building and construction materials of all kinds, etc. It was not authorized to operate as a railway company.

Some time after the Malvern Gravel Company came into existence as a corporation, for the consideration of

$2,500 per year, it leased from the M & O, a corporation that had never operated as "a going railroad", the short right-of-way and a railroad engine owned by M & O. The gravel company leased rails from the Missouri Pacific and caused them to be placed on the right-of-way it had leased from the M & O. By using the leased engine, rails and right of way the gravel company has been able to move its products from its plant to a point where they could be placed on the main lines of the Missouri Pacific and Rock Island Railroads, and thus transported in both intrastate and interstate commerce.

The gravel company has never held itself out as a common carrier. In fact, with the exception of a few times, its railway facilities have been used by no one except the gravel company itself. At one time a road contractor had a "batch" plant located on gravel company property near the gravel plant. The gravel company was selling material to the contractor, and used its own railway facilities to deliver, on its own property, the material it was selling to the contractor. About a half dozen other times the gravel company, as a favor, permitted its facilities to be used, on the gravel company property, to unload material purchased elsewhere by others who did not have a convenient place or facilities to unload heavy material. No charge was made for such accommodations. The gravel company merely did a few friendly acts to help some neighbors.

The Missouri Pacific delivered and picked up its cars on the gravel company property. The gravel company, with its engine, picked up empties and delivered the cars that it had loaded with its own material to the Rock Island and was allowed $5.00 per car for doing so. This was done because the Arkansas Commerce Commission had a rule that a railroad company must do the switching or pay the customer for doing it. The Missouri Pacific did its own switching in connection with the gravel plant, but the Rock Island chose to pay the gravel company for doing it.

The Malvern Brick & Tile Company is near the gravel company property. The railroad track of the gravel company crosses property belonging to the brick company. The brick company also has a locomotive, and uses a portion of the track in question and helps to maintain it. The gravel company never handles any material for the brick company.

Appellant argues that the burden of proof was on plaintiffs, appellees, to show that the Federal Employers' Liability Act is applicable, and appellees concede that they had the burden of proof in that respect.

To sustain their contention that the gravel company is a common carrier, appellees, in their excellent brief, rely to a large extent on what are known as the "Tap Line Cases", 234 U.S. 1. There, a number of lumber companies who operated short line railroads contended that they were common carriers; they held themselves out as such, and maintained that as common carriers they were entitled to a rebate of a part of the tariff collected by the principal railroads hauling the shipments. The Tap Line Cases are easily distinguishable from the case at bar. In those cases the court said: "They [the Tap Lines] are engaged in carrying for hire the goods of all those who see fit to employ them." This statement in itself shows that the tap lines were common carriers. In the case at bar, there is no showing that the gravel company ever held itself out as being willing to haul for others, for hire or otherwise. In fact, the evidence is completely convincing that the gravel company operated the 1¾ miles of railroad solely for the purpose of getting its own products to market, and for no other purpose.

Appellees also rely heavily on *Kach* v. *Monessen Southwestern Ry. Co.*, 151 F. 2d 400, but there the issue was whether the railroad company was operating in interstate commerce, and not whether it was a common carrier.

Appellees cite several other cases as supporting their argument that the gravel company is a common carrier.

We have carefully examined all the cited cases. They are distinguishable on the facts, and it would unduly extend this opinion to deal at length with each case. Appellees also suggest that the gravel company is a common carrier because of its close connection with the M & O Railroad.

There are three things that must combine to constitute a common carrier within the meaning of the Federal Employers' Liability Act; (1) a carrier must be engaged in interstate commerce; (2) it must operate a railroad in interstate commerce; and (3) it must operate a railroad as a common carrier.

Even if we should find that the M & O and the gravel company are so closely associated that they could be considered as one company, and that such cases as *Black & White, Inc.* v. *Love,* 236 Ark. 529, 367 S.W. 2d 427, are applicable in that respect, it would not help appellees because according to many decisions of the Federal Courts, neither the M & O or the gravel company, or the two companies operating individually or in concert with one another have ever operated as a common carrier within the meaning of the Federal Employers' Liability Act. Time and again the Federal Courts have defined a common carrier that comes within the meaning of the Act. We are bound by the decisions of the Federal Courts in that respect. *Chicago, R.I. & P.R. Co.* v. *Wright,* Okla. 1954, 278 P. 2d 830, certiorari denied, 75 S. Ct. 581, 349 P.S. 905, 99 L. Ed. 1241.

In *Duffy* v. *Armco Steel Corp.,* 225 F. Supp. 737 (1964), the court held that a defendant is not "a common carrier by railroad" for purposes of Employers' Liability Act where defendant owned and operated railroad equipment within its manufacturing plant, the equipment being used to transport material over leased right of way. The court said: "The railroad equipment owned and operated by Armco has not been used to transport goods of others, nor has Armco offered their use to the public. Thus, it appears to a certainty that there is no genuine issue as to any material fact in this case. De-

fendant asserts, and the Court agrees, that defendant although operating in interstate commerce is not a common carrier by railroad.'' It was held in *Tilson* v. *Ford Motor Co.,* 130 F. Supp. 676 (1955), that where the operation of a railroad by an automobile manufacturer served only the automobile manufacturer, the automobile manufacturer was not a common carrier within the meaning of the Federal Employers' Liability Act.

In *Kelly* v. *General Electric Co.,* 110 F. Supp. 4, the electric company owned rolling stock and tracks and its tracks were partly located in the bed *of a public street* and were connected with those of a railroad common carrier. It shipped goods F.O.B. plant and moved cars partially loaded with goods of others. But it did not hold itself out as a common carrier and did not carry for hire the goods of others. The court held that it was not a common carrier within the meaning of the Federal Employers' Liability Act. There, the court said: ''The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant. The dominant and controlling factor in determining the status of one as a common carrier is his public profession as to the service offered or performed.''

In *Jones* v. *N.Y. Cent. R. Co.,* 182 F. 2d 326 (1950), the court quoted the language of the U.S. Supreme Court in *Wells Fargo & Co.* v. *Taylor,* 254 U.S. 175, to the effect that a common carrier for the purposes of the Federal Employers' Liability Act is one who operates a railroad as a means of carrying for the public.

There is no substantial evidence in the record that appellant or M & O operated a railroad as a means of carrying for the public. In other words, there is no substantial evidence that either or both companies operated as a common carrier within the meaning of the Federal Employers' Liability Act.

Reversed and dismissed.

McFADDIN & JOHNSON, J.J., dissent.

856

Ed. F. McFaddin, Associate Justice, (dissenting). The Majority Opinion states the issue in the first paragraph: "If there is substantial evidence that the gravel company is a common carrier, within the meaning of the Federal Employers' Liability Act, the Trial Court was correct in refusing to direct a verdict for appellant, but if there is no substantial evidence that the gravel company is a common carrier within the meaning of the aforesaid Act, the judgments must be reversed." Then in a subsequent paragraph the Majority Opinion has this statement: "There are three things that must combine to constitute a common carrier within the meaning of the Federal Employers' Liability Act: (1) a carrier must be engaged in interstate commerce; (2) it must operate a railroad in interstate commerce; and (3) it must operate a railroad as a common carrier."

I propose to take these three essentials and demonstrate that there is ample and substantial evidence to take the case to the jury on each of these three essentials. It is not for this Court to sit as an appellate jury and render a factual finding on each of these three essentials: it is our duty to determine whether there is substantial evidence to take the fact questions to the jury; and this I now propose to demonstrate as to each of the three essentials listed in the Majority Opinon, as above quoted.

I. *The Malvern Gravel Company Was A Carrier Engaged In Interstate Commerce.* The proof abundantly shows that the Malvern Gravel Company made carload shipments of gravel over its railroad track from its plant to various states, and transported over its tracks shipments from outside Arkansas. So the Malvern Gravel Company was engaged in interstate commerce. That the Malvern Gravel Company was a carrier so engaged in interstate commerce is clearly demonstrated by the fact that the Malvern Gravel Company was the same as the Malvern & Ouachita River Railroad, even though they existed as separate corporations.

The record shows that the Malvern & Ouachita River Railroad was incorporated and received its charter from the State of Arkansas on April 30, 1929, ". . . for the purpose of forming a railroad corporation to incorporate, own, construct and operate a short line of railroad necessary to the successful mining quarrying and marketing of stone, rock and other materials . . ." The incorporators certified that 391 shares of the 400 shares were owned by Frank McGillicuddy, and that the railroad would be about four and one-half miles long in Hot Spring County, Arkansas. In order to acquire a part of the right of way, the Malvern & Ouachita River Railroad exercised the power of eminent domain in the Hot Spring Circuit Court in May 1929. So we have an Arkansas railroad corporation exercising the power of eminent domain. Article 17, Section 1 of the Arkansas Constitution states: "All railroads, canals and turnpikes shall be public highways, and all railroads and canal companies shall be common carriers." Notice the language: ". . . all railroads . . . shall be common carriers."

That the Malvern Gravel Company is the same as the Malvern & Ouachita River Railroad is abundantly established from the evidence. On April 3, 1931, the *Malvern Gravel Company* entered into a signed contract with the Missouri Pacific Railroad Company. Mr. Frank McGillicuddy—previously stated as owning 391 of the 400 shares of the issued stock of the Malvern & Ouachita River Railroad—signed the agreement as representing both the Malvern Gravel Company and the Malvern & Ouachita River Railroad. The instrument is so enlightening that I copy pertinent excerpts:

"It is understood that the Missouri Pacific, in compliance with recent order of the Arkansas Railroad Commission, desires to perform the service required of it by the Commission's order in connection with the service mentioned in the caption, in lieu of paying to the Gravel Company the allowance prescribed by the Commission, in the event the work is performed by the Gravel Company rather than by the railroad. In order to carry out this arrangement, the following is agreed upon:

"1. The Malvern Gravel Company (Malvern & Ouachita River Railroad Company) will provide track upon which Missouri Pacific engines and cars may be safely operated between the Missouri Pacific main line connection and the loading facilities of the Malvern Gravel Company; the latter being located approximately one and three quarters (1¾) miles from the Missouri Pacific main line. . . .

"2. The Malvern Gravel Company (Malvern & Ouachita River Railroad) will provide suitable track facilities convenient to its plant where empties will be set out by the Missouri Pacific engine and crew, also suitable track or tracks from which loads will be moved by the Missouri Pacific crew. Commercial loads for movement via Missouri Pacific will be placed together by the Malvern Gravel Company (Malvern & Ouachita River Railroad) on designated tracks so that switching in the plant by the Missouri Pacific crew for the purpose of getting this business together, will not be necessary. . . .

"4. The hour or hours at which Missouri Pacific will make trip to plant of the Malvern Gravel Company (Malvern & Ouachita River Railroad) will be agreed upon between representatives of the two companies on the ground, and may be changed from day to day as conditions require, by mutual agreement between these representatives. . . .

"/s/W. E. Lamb, Superintendent—Mo. Pac. RR. Co.

"/s/Frank McGillicuddy, Representing Malvern Gravel Co.

(Malvern & Ouachita River RR. Co.)"

It will be observed that the Malvern & Ouachita River Railroad was the name placed in parenthesis after Malvern Gravel Company in each instance, and this certainly indicates that the two were considered as one. On January 21, 1932, Malvern Gravel Company became a Delaware corporation and on January 25, 1932, it qualified to do business in Arkansas, and has so remained.

On June 1, 1934, Malvern Gravel Company leased from the Missouri Pacific Railroad Company track materials consisting of 27,114 lineal feet of steel rails, and also angle bars, frogs, guard rails, switch plates, and other such materials for operating a railroad. The charter of the Malvern Gravel Company did not authorize it to construct a railroad track, yet it did so because its alter ego, Malvern & Ouachita River Railroad, needed a railroad track. In the present case Mr. Sam R. Clark testified that he was President of both companies. I copy excerpts from his testimony:

"Q. State your name, please, sir.

"A. Sam R. Clark.

"Q. Mr. Clark, are you connected with the Malvern Ouachita River Railroad in any way?

"A. Yes, sir. I'm president of both companies.

"Q. What do you mean both companies?

"A. Malvern Gravel Company and Malvern Ouachita River Railroad Company.

"Q. All right. Mr. Clark, what operations are carried on by the Malvern and Ouachita River Railroad Company? Do they carry on any operations at all?

"A. No, it's just a book corporation is all it is . . .

"Q. For what purpose was that railroad incorporated?

"A. It is my understanding that the only reason the railroad was incorporated was to condemn the right of way from the plant site to the Missouri Pacific switching yards. . . .

"Q. What is the relationship between the Malvern and Ouachita River Railroad Company and the Malvern Gravel Company?

"A. Malvern Gravel Company owns stock in the company.

"THE COURT: What was your answer?

"A. I said the Malvern Gravel Company owns stock in the company. There's a hundred shares of stock in the Malvern Ouachita River Railroad Company and the Malvern Gravel Company owns 97 shares of that stock. I own a share and my wife owns a share and Wilburn Cox owns a share. According to Arkansas Law there has got to be three incorporators, so Malvern Gravel Company owns all the stock except the three shares.

"Q. Does Malvern Gravel Company have any lease with the Malvern Ouachita River Railroad Company?

"A. Yes, sir.

"Q. What is the rental on that lease?

"A. Twenty-five hundred per year.

"Q. Do you rent all the facilities of the Malvern and Ouachita River Railroad Company?

"A. Yes, sir.

"'Q. How long have you been operating under that lease, ever since you have been there?

"A. Ever since I have been there, and I don't know how long before that. I have been there for 15 years. . . .

"Q. Your Malvern and Ouachita River Railroad Company rents or leases its track and other material to the Malvern Gravel Company, is that correct?

"A. Yes, sir.

"Q. And you pay $2,500.00 per year on that lease?

"A. Yes, sir.

"A. Yes, sir.

"Q. What other property does the Malvern and Ouachita River Railroad Company own besides the track down there?

"A. They own about three different parcels of right of way along that railroad.

"Q. Well, what other personal property to they own?

"A. They own the locomotive.

"Q. They own the locomotive?

"A. Yes, sir.

"Q. Now that's the locomotive that does the switching down there, is that correct?

"A. Yes, sir.

"Q. That is in the Malvern Gravel Company plant down there?

"A. Yes, sir. . . .

"Q. Who is president of Malvern & Ouachita River Railroad Company?

"A. I am.

"Q. How long have you been president of it?

"A. Roughly I would say about six or eight years.

"Q. Do you have a board of directors for Malvern and Ouachita River Railroad Company?

"A. Yes, sir.

"Q. Would you name some of the individuals on that board?

"A. I am on the board and Frank Riley and Bill Riley was on the board. We haven't replaced him. He is deceased.

"Q. Now, is this the same board that operates the Malvern Gravel Company?

"A. Yes, sir."

The State and Federal income tax returns of Malvern & Ouachita River Railroad were introduced in evi-

dence. These showed the only income of the Malvern & Ouachita River Railroad to be $2,500.00 per year, which it was testified was the lease money paid to it by the Malvern Gravel Company.

The fact that the Malvern Gravel Company and the Malvern & Ouachita River Railroad are separate corporations affords the Malvern Gravel Company no immunity, because courts disregard the fiction of the corporate entity in order to do justice. This is discussed in detail in 13 Am. Jur. p. 160 *et seq.*: "A subsidiary or auxiliary corporation which is created by a parent corporation merely as an agency for the latter may sometimes be regarded as identical with the parent corporation, especially if the stockholders or officers of the two corporations are substantially the same or their systems of operation unified." This principle of disregarding the claim of separate corporations has been applied to railroad companies. In *Chicago, Milwaukee RR. Co.* v. *Minneapolis Civic Assn.*, 247 U.S. 490, 62 L.Ed. 1229, the United States Supreme Court held that a railroad company owning what are obviously merely terminal or spur delivery tracks in a city and which is a mere agency or instrumentality of two other railroad companies entering the city which owned its capital stock and controlled its operations, cannot be regarded as an independent public carrier merely because it is technically a separate legal entity. In *Buie* v. *Chicago R. I. Ry. Co.*, 95 Tex. 51, 65 S.W. 27, 55 L.R.A. 86, the Supreme Court of Texas held that when one corporation makes use of another as its instrument through which to transact its business, the principal corporation is really represented by the agent of the sub-corporation and its liability is the same as if it had done business in its own name.[1]

The Arkansas Supreme Court has pierced the fiction of the corporate entity when justice so demanded.

---

[1] In 1 A.L.R. 610 there is an annotation entitled: "Disregarding corporate existence"; and in Section III of that annotation there are given many instances wherein courts have considered the parent company and the subsidiary company to be one and the same. To the same effect see also annotations in 34 A.L.R. 599 and 63 A.L.R. 2d 1055.

Some of these cases are: *Rounds and Porter* v. *Burns,* 216 Ark. 288, 225 S.W. 2d 1; *Plant* v. *Cameron,* 228 Ark. 607, 309 S.W. 2d 312 and *Black & White* v. *Love,* 236 Ark. 529, 367 S.W. 2d 427. In *Rounds and Porter* v. *Burns, supra,* we pierced the fiction of separate corporate entities, and held the parent corporation liable for the debt of its subsidiary because the parent corporation manipulated the subsidiary "to its own advantage at the expense of the appellee. Under the principles already stated this conduct entitles the appellee to a judgment directly against the parent corporation without regard to the separate entitle of the subsidiary." In *Plant* v. *Cameron, supra,* we held the parent corporation (Cameron) liable for the debt of the subsidiary corporation (Nashville), saying: "Though the corporations are separate legal entitles it would constitute a constructive fraud in this case to allow Nashville to now claim an entirely separate existence from Cameron." In *Black & White* v. *Love, supra,* there were two taxicab companies, one being Black & White and the other being Checker Cab Company. Love sued Black & White which defended on the ground that only Checker Cab Company was liable. We affirmed a judgment against Black & White, saying: "Furthermore, the two corporations were owned by the same shareholders, operated by the same officers, and the cabs were interchanged. It would be putting fiction above right and justice to allow Black & White to hide behind the corporate entity of Checker in this case."

The evidence is clear that Malvern Gravel Company and Malvern & Ouachita River Railroad were one and the same corporation, and that Malvern Gravel Company was a carrier engaged in interstate commerce.

II. *The Malvern Gravel Company Operated A Railroad In Interstate Commerce.* As previously stated, the evidence showed beyond peradventure of a doubt that the Malvern Gravel Company's railroad received and transported over its railroad tracks, with its engine, carload shipments from outside Arkansas, and also shipped its

products over its railroad tracks onto the Missouri Pacific track; and these cars moved in interstate commerce. So, clearly, the Malvern Gravel Company was operating a railroad in interstate commerce. There is no necessity to further dwell on this point.

III. *The Malvern Gravel Company Operated A Railroad As A Common Carrier.* I now point out some of the instances in the record where evidence was introduced that the Malvern Gravel Company acted as a common carrier:

(a) Pursuant to a tariff filed with the Arkansas Commerce Commission, the Rock Island Railroad paid to the Malvern Gravel Company $5.00 a car for the services which Malvern Gravel Company rendered the Rock Island Railroad in picking up empties at Abco (a switching point) and bringing the loaded cars back to that point. Thus, the Malvern Gravel Company received, and is receiving, $5.00 per car from the Rock Island Railroad for switching cars over the tracks of the Malvern Gravel Company.

(b) The Malvern Brick & Tile Company uses a part of the railroad track of the Malvern Gravel Company under a joint maintenance agreement.

(c) In 1957 two cars of limestone from Neosho, Missouri, consigned to the Arkansas Highway Department, were switched by the Malvern Gravel Company over its railroad tracks and unloaded from a location on the tracks of the Malvern Gravel Company.

(d) In 1962 several cars of steel beams from Tulsa, Oklahoma, consigned to Fairchild Construction Company, were likewise switched by the Malvern Gravel Company over its railroad tracks and unloaded from a location on the tracks of the Malvern Gravel Company.

(e) In 1963 two cars of cinders from Strawn, Arkansas, consigned to the Malvern Public School, were likewise switched by the Malvern Gravel Company over its railroad tracks and unloaded from a location on the tracks of the Malvern Gravel Company.

Altogether it was shown that over a dozen cars moved in interstate shipment over the tracks of the Malvern Gravel Company. There is no instance in the record where the Malvern Gravel Company ever refused to do any hauling offered to it by anyone. The fact that the Malvern Gravel Company did not post tariffs does not prevent it from being a common carrier. One isolated incident of hauling over its tracks as a common carrier might not be sufficient but repeated incidents over a number of years, as here shown, certainly made a case for the jury; and the Malvern Gravel Company, a common carrier under the laws of Arkansas, is shown to have repeatedly hauled and transported interstate shipments.

The Majority Opinion cites the following cases as instances in which a corporation was held to be outside the Federal Employers' Liability Act. These cases are: *Duffy* v. *Armco Steel Corp.*, 225 F. Sup. 737; *Tilson* v. *Ford Motor Co.*, 130 F. Sup. 676; *Kelly* v. *General Elec. Co.*, 110 F. Sup. 4; and *Jones* v. *N.Y. Central*, 182 F. 2d 326. In none of these cases[2] was there a factual situation like that in the case at bar; so I forego discussing them. As aforesaid, there is no instance ever shown werein Malvern Gravel Company refused to haul interstate shipments over its tracks; and there are repeated instances, as above mentioned, wherein the Malvern Gravel Company actually did haul interstate shipments over its tracks. I submit that these instances are enough to submit the issue to the jury for decision as to whether the Malvern Gravel Company operated a railroad as a common carrier.

---

[2] The Majority Opinion states: "Time and again the Federal Courts have defined a common carrier that comes within the meaning of the Act. We are bound by the decisions of the Federal Courts in that respect." I maintain that the Arkansas Supreme Court is "bound" only by the decisions of the United States Supreme Court. The decisions of other Federal Courts are only persuasive.

## CONCLUSION

This is a long dissent, but the Majority Opinion strikes at the very heart of our jury system. As an appellate Court we are not to decide what we think the evidence shows in a jury case: we are to decide whether there was substantial evidence to take the factual issue to the jury for its decision. Because I believe so thoroughly in the jury system, I cannot in good conscience remain silent when I see a fact question decided by the appellate court instead of by the jury as the Constitution provides.

Therefore, I respectfully dissent.

JOHNSON, J., joins in this dissent.