[No. 2688–2.   Division Two.   December 30, 1977.]

ROSA DONATO, *Respondent*, v. UNITED GRAIN CORPORATION,
ET AL, *Defendants*, THE PORT OF TACOMA,
*Appellant.*

Craig P. Campbell, Neil S. Gladson, and Karr, Tuttle, Koch, Campbell, Mawer & Morrow, for appellant.

Michael S. Manza and Manza, Moceri, Gustafson & Messina, for respondent.

PETRIE, J.—The defendant Port of Tacoma appeals from a summary judgment order denying its motion for dismissal and granting the plaintiff's motion to hold the defendant Port a common carrier by railroad. On appeal the sole issue is whether or not the Port of Tacoma was a common carrier by railroad within the meaning of the Federal Employers' Liability Act (FELA) when the cause of action accrued. We affirm the summary judgment order.

For purposes of this appeal the operative facts which gave rise to this lawsuit may be summarized as follows. Vincenzo Donato was struck and killed by a railroad car on June 21, 1973, in the course of his employment with the Port of Tacoma as a member of the track crew. Prior to the accident the boxcar loaded with grain had been delivered by the City of Tacoma Belt Line Railway to the Eleventh Street interchange at the Port of Tacoma. From the interchange area a Port locomotive transferred the car over Port rails to the United Grain Corporation elevator. United Grain employees emptied the offending car and released it on a sloping track where it rolled by gravity, uncontrolled and unattended down the track and struck Mr. Donato. The Port owns the elevator leased to United Grain and controls the area where Donato was killed. Practically all (99 percent) of the commodities which flow through United Grain's facilities arrive by rail.

Rosa Donato, surviving spouse and personal representative of the estate of Vincenzo Donato, commenced this action against the Port and others to recover damages for her husband's wrongful death. Continuation of the action against the Port is dependent upon the question of whether or not at the time of Mr. Donato's death the Port was engaged in commerce as a "common carrier by railroad" pursuant to the provisions of the Federal Employers' Liability Act, 45 U.S.C. § 51. *See* RCW 51.12.080. Both parties moved for summary judgment on this issue. The trial court found that no genuine issue of material fact existed and entered an order from which the defendant Port appeals.

The Port acknowledges that it was engaged in interstate commerce when it provided rail–switching services for movement of cargo on its premises, but contends that those services did not constitute rail service of a kind sufficient to render it a common carrier by railroad.

In *Lone Star Steel Co. v. McGee,* 380 F.2d 640 (5th Cir. 1967), the court enunciated four considerations of prime importance in determining whether a particular entity is a common carrier by railroad:

First—[whether there is] actual performance of rail service, second—[whether] the service being performed is part of the total rail service contracted for by a member of the public, third—[whether] the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public, and fourth—[whether] remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad.

*Lone Star Steel Co. v. McGee, supra* at 647.

The Port of Tacoma has facilities for and provides complete cargo–handling services as an import–export distribution center in the Commencement Bay area. It services cargo arriving from and departing for points all over the world. In 1973 the Port area was served by three interstate

railroads, the Union Pacific, Burlington Northern, and Milwaukee Road. The Union Pacific and Burlington lines were connected to the Port through the Municipal Belt Line Railway; the Milwaukee has a contractual right-of-way directly to the docks. Exports arriving by rail were delivered to the Eleventh Street interchange. The loaded cars were then switched by Port employees to precise unloading points within the terminal area, unloaded, and returned to the interchange. The boxcars were transferred from the interchange area to the dockside loading facility by Port-owned locomotives over the Port's own rail system. Altogether the Port owned 73,000 feet of railroad trackage and two switching locomotives, all of which were maintained and operated by 12 to 14 Port employees who were longshoremen and not members of the railroad brotherhood.

These facilities and activities indicate to us that the Port performed actual rail services, and that it was not merely a passive owner of rail properties from which it derived income. *See McCrea v. Harris County Houston Ship Channel Navigation Dist.,* 423 F.2d·605 (5th Cir. 1970). Indeed, the affidavit of the Port's director of safety states that the Port provides rail services for its tenants. However, maintaining a railroad facility, without more, would not render the Port a common carrier by railroad for purposes of FELA liability. *Ciaccio v. New Orleans Public Belt R.R.,* 285 F. Supp. 373 (E.D. La. 1968).

The Port contends that its switching services were not being performed as part of the total rail service contracted for by a member of the public. The facts indicate that the Port was and is a most vital link to a total rail service. Indeed, without the switching services, leased storage facilities of the United Grain Corporation, for example, would be isolated and valueless. It is inconceivable that an importer or exporter would consider use of the Port without dockside switching services connecting their cargo with points of origin and destination.

The Port also contends that it was not a common carrier because it did not hold itself out to the public as engaged in transporting cargo from place to place. We find no merit to this contention. Advertising brochures sent to potential users of the Port's facilities declared that its rail service included "Dockside switching by the Port of Tacoma." Another brochure asserted:

PORT RAILROAD SWITCHING FACILITIES:
Besides *its own* dockside–to–mainline switching *railroad,* the Port is served by three transcontinental railroads: Burlington Northern, Milwaukee Road, and Union Pacific. Another convenience: Free industrial switching on all line hauls by the city's Belt Line Railway.

(Italics ours.)

Finally, the Port contends that it performs the switching services without receiving any compensation therefor; hence it cannot be considered a carrier *for hire.*

In order to resolve this issue we must take a closer look at the facts. Ever since 1947, when the Interstate Commerce Commission determined that the Port's switching services did not warrant classification as a common carrier subject to the Interstate Commerce Act, the Port has assiduously avoided billing anyone for the costs incurred in conducting those services. The Port's accounting procedures classified all such costs, with one exception noted *infra,* as operating expenses which had to be absorbed as contributing toward operating losses. The Port does not operate at a loss; its other sources of income have obviously been sufficient to offset any loss occasioned by reason of the "free" switching services it has provided to those who used those services.

The Port's revenues are derived from a multiplicity of charges as set forth in its tariff No. 5 which has been filed with the Federal Maritime Commission and from rental of some of its facilities. The tariff document is not a part of the record, but fairly substantial discovery procedures, during which that document was used as a foundation for inquiry on deposition, fail to reveal any indication that the

Port's tariff schedules contemplate any charge for switching services.

Among the Port's authorized activities is leasing various facilities to tenants, some of whom also utilize the switching services. One of those tenants is United Grain Corporation. Its 12–year lease of a grain storage complex from the Port dated July 1, 1969, contains the following provision:

> The Lessor will cause to be switched all railroad cars to and from the grain elevator as required by the Lessee free of cost to the Lessee, except that when the switching services of the Lessor are required by the Lessee after 5:00 p.m., and before 8:00 a.m., and on Saturdays, Sundays and holidays, the actual cost of the switch crew, plus twenty percent (20%) will be charged against the Lessee for such time as the switching service is employed solely by the Lessee.

These charges for overtime use of switching facilities are the only direct charges imposed by the Port for its rail services. In 1973 (and thereafter) the Port billed United Grain, on the average, 5 days per month for the overtime use of these services.

The Port auditor's deposition indicates that the negotiated rentals incorporated within leases between the Port and its tenants are predicated only on an attempt to amortize the cost of the facility within a certain length of time, and that the overall cost of rail services provided by the Port is not a factor in determining the rental charges.

When asked whether or not the interstate carriers charged their customers for any portion of the rail movement handled by the Port, the Port's assistant manager responded, "Not as a separately identifiable factor."

■■ In the course of analyzing this record, the trial court noted that the Port is a municipal corporation operating within the constraints imposed by article 8, section 7 of the Washington State Constitution prohibiting municipal corporations from making a gift of property. The court also noted that the compensation received by a carrier for its services need not be limited to direct charges; it is sufficient

that the monetary return is indirectly received. *Lone Star Steel Co. v. McGee, supra.*

The trial court then concluded the Port's assertion that it was performing switching services without compensation is analogous to that of the parking lot owners in *McDonald v. Irby,* 74 Wn.2d 431, 445 P.2d 192 (1968) who charged their customers a $1–per–day fee which included transportation from the parking lot to an airline terminal. Those owners contended they were not common carriers because they made no additional charge for the transportation. The court in *McDonald* categorized that reasoning as "economically unrealistic," and concluded that the additional service was not gratuitous because the cost of transportation must, of necessity, be an element in determining the parking fee.

The question of whether or not a particular entity is a common carrier is a matter of law to be decided by the court. *McDonald v. Irby, supra.* In our analysis of the record we are constrained to conclude that the facts in evidence and reasonable inferences derived therefrom support the trial court's order. The Port's lease with United Grain, for example, requires the Port to switch railroad cars to and from the United Grain elevator. Although the lease recites that the Port will perform those services "free of cost" to United Grain, except for the overtime charges, it is not reasonable to assume that United would have executed a lease without some assurances that it had a contractual right to demand those switching services for 99 percent of the commodities passing through its facility. The Port's promise to provide those services was, therefore, a significant consideration to the execution of that lease. If, as the Port officials choose to assert, there was no consideration for that promise, then the contractual right to demand performance would be remarkably hollow. Paraphrasing *McDonald v. Irby, supra,* the cost of the rail services provided to United "must, of necessity, be an element" in determining the consideration for the lease; any other inference would be "economically unrealistic."

Accordingly, we hold that to the extent the Port of Tacoma provided actual rail services for the benefit of its customers and tenants in 1973, it performed those services as a common carrier by railroad within the meaning of that term as used in the Federal Employers' Liability Act.

Judgment affirmed.

PEARSON, C.J., and REED, J., concur.

Reconsideration denied January 24, 1978.

Review denied by Supreme Court June 2, 1978.